# MASTER SERVICES AGREEMENT
## MSA-141890

This master services agreement ("**Agreement**") between **AETNA LIFE INSURANCE COMPANY**, a Connecticut corporation located at 151 Farmington Avenue, Hartford, Connecticut ("**Aetna**"), and **AFFILIATED PHYSICIANS AND EMPLOYERS MASTER TRUST**, located at 399 Campus Drive, Suite 300, Somerset, New Jersey 08873 ("**Customer**") is effective as of July 1, 2019("**Effective Date**").

The Customer has established one or more self-funded employee benefits plans, described in Exhibit 1, (the "**Plan(s)**"), for certain covered persons, as defined in the Plan(s) (the "**Plan Participants**").

The Customer wants to make available to Plan Participants one or more products and administrative services ("**Services**") offered by Aetna, as specified in the attached schedules, and Aetna wants to provide those Services to the Customer for the compensation described herein.

The parties therefore agree as follows:

1. **TERM**

The initial term of this Agreement will be sixty-six (66) months beginning on the Effective Date ("Initial Term"). This Agreement will automatically renew thereafter annually unless otherwise terminated pursuant to section 17 (Termination). The initial term and each successive one year renewal shall be considered an "**Agreement Period.**" The schedules may provide for different start and end dates for certain Services.

2. **SERVICES**

Aetna shall provide the Services described in the attached schedules.

3. **STANDARD OF CARE**

Aetna and the Customer will discharge their obligations under this Agreement with that level of reasonable care which a similarly situated services provider or plan administrator, respectively, would exercise under similar circumstances. If the Customer delegates claim fiduciary duties to Aetna pursuant to the applicable schedule, Aetna shall observe the standard of care and diligence required of a fiduciary under ERISA Section 404(a)(1)(B).

4. **SERVICE FEES**

The Customer shall pay Aetna the fees according to the Service and Fee Schedule(s) ("**Service Fees**") attached to and incorporated as part of this Agreement. Within 180 days prior to the end of the Initial Term, the parties shall negotiate in good faith a succeeding set of terms and conditions. If the parties are unable to come to agreement, the current fees will extend one year not to exceed ▮ Service Fees during the Initial Term also are subject to good faith negotiation if additional Aetna products are added to Customer's plan offerings, regulatory disruptions, or upon Customer's request.

Customer shall self-bill to provide Aetna with a monthly statement indicating the Service Fees owed for that month based on its enrollment updates as of the first of that month. The Customer shall pay Aetna the Service Fees no later than 31 calendar days after the first calendar day of the month in which the Services are provided

Master Services Agreement                    1                    04.08.2019

Proprietary

(the "**Payment Due Date**"). The Customer shall provide with their payment either a copy of the Aetna invoice, modified to reflect current eligibility, or a copy of a pre-approved invoice which meets Aetna's billing requirements. The Customer shall also reimburse Aetna for certain additional expenses, as stated in the Service and Fee Schedule(s). All other fees shall be agreed to by Aetna and the Customer in advance in writing.

All overdue amounts are subject to the late charges outlined in the Service and Fee Schedule(s).

Aetna shall prepare and submit to the Customer an annual report showing the Service Fees paid.

## 5. BENEFIT FUNDING

The Customer shall choose one of the banking facilities offered by Aetna through which Plan benefit payments, Service Fees and Plan benefit related charges will be made. All such amounts will be paid through the banking facility by check, electronic funds transfer or other reasonable transfer methods. The Customer shall reimburse the banking facility for all such payments within twenty-four (24) hours of such request. All such reimbursements will be made by wire transfer in electronic funds transfer (EFT) or federal funds using the instructions provided by Aetna, or by another transfer method agreed upon by both parties.

Since funding is provided on a checks issued basis, Customer and Aetna agree that outstanding payments to providers (e.g., uncashed checks or checks not presented for payment) will be handled in the manner indicated and memorialized by the Parties in a separate form (Customer Election Page). The terms and conditions of this Agreement shall apply to the Customer Election Page.

In the event that Aetna has exercised its right to suspend claim payments or terminate this Agreement as stated in section 17(B) (2) (Termination), Aetna may place a stop payment order on all of the Customer's outstanding benefit checks which are unfunded at that time.

## 6. FIDUCIARY DUTY

It is understood and agreed that the Customer, as plan administrator, retains complete authority and responsibility for the Plan, its operation, and the benefits provided there under, and that Aetna is empowered to act on behalf of the Customer in connection with the Plan only to the extent expressly stated in this Agreement or as agreed to in writing by Aetna and the Customer.

Aetna acknowledges that Customer has designated Concord Management Resources ("the Trust Management Company") as Trust Management Company authorized by the Customer through its representatives to provide direction to Aetna with regard to Services provided herein. Customer shall notify Aetna of any changes to its authorized Trust Management Company or its authorization herein at least thirty (30) days prior to the effective date of such change.

The Customer has the sole and complete authority to determine eligibility of persons to participate in the Plan.

Claim fiduciary responsibility is identified in the applicable Schedule.

## 7. CUSTOMER'S RESPONSIBILITIES

(A) **Eligibility** – The Customer shall supply Aetna, by electronic medium as agreed to between Aetna and Customer, with all relevant information identifying Plan Participants and shall notify Aetna following any changes in Plan participation through its next scheduled electronic eligibility file as changes are processed. Aetna is not required to honor a notification of termination of a Plan Participant's eligibility which Aetna receives more than 90 days after termination of such Plan Participant. Aetna has no responsibility for determining whether an individual meets the eligibility requirements of the Plan.

(B) **Plan Document Review** – The Customer shall provide Aetna with all Plan documents at least 30 days prior to the Effective Date. Aetna will review the Plan documents to determine any potential differences that may exist among such Plan documents and Aetna's claim processing systems and internal policies and procedures. Aetna does NOT review the Customer's Summary Plan Description ("SPD") or other Plan documents for compliance with applicable law. However, in its production of the Customer's Summary of Benefits and Coverage ("SBC(s)"), Aetna will make good faith efforts to develop and review the SBC(s) for compliance with applicable law, [REDACTED]

(C) **Notice of Plan or Benefit Change** – The Customer shall notify Aetna in writing of any changes in Plan documents or Plan benefits (including changes in eligibility requirements) at least 30 days prior to the effective date of such changes. Aetna will have 10 days following receipt of such notice to inform the Customer whether Aetna will agree to administer the proposed changes and provide a reasonable timeframe for completing such changes. If the proposed changes increase Aetna's costs, alter Aetna's ability to meet any performance standards or otherwise impose substantial operational challenges, Aetna may require an adjustment to the Service Fees or other financial terms.

(D) **Employee Notices** – The Customer shall furnish each Employee covered by the Plan written notice that Aetna has no financial liability for the payment of Plan benefits. The Customer shall inform its Plan Participants, in a manner that satisfies applicable law, that confidential information relating to their benefit claims may be disclosed to third parties in connection with plan administration.

(E) **Third Party Consents** – The Customer shall obtain any consents, authorizations or other permissions from Employees or relevant third parties, which may be required under law or otherwise necessary in order for Aetna to access, use or disclose information and data for the purposes of providing Services under this Agreement.

(F) **Miscellaneous** – The Customer shall promptly provide Aetna with such information regarding administration of the Plan as required by Aetna to perform its obligations and as Aetna may otherwise reasonably request from time to time. Aetna is entitled to rely on the information most recently supplied by the Customer in connection with the Services and Aetna's other obligations under the Agreement. Aetna is not responsible for any delay or error caused by the Customer's failure to furnish correct information in a timely manner. Aetna is not responsible for responding to Plan Participant requests for copies of Plan documents. The Customer shall be liable for all Plan benefit payments made by Aetna, including those payments made

following the termination date or which are outstanding on the termination date. Aetna agrees to adjudicate benefits in accordance with the Plan document.

8. **RECORDS**

   Aetna, its affiliates and authorized agents shall use all Plan-related documents, records and reports received or created by Aetna in the course of delivering the Services ("**Plan Records**") in compliance with applicable privacy laws and regulations. Aetna may de-identify Plan Records and use them for quality improvement, statistical analyses, product development and other lawful, non-Plan related purposes. Such Plan Records will be kept by Aetna for a minimum of seven years, unless Aetna turns such documentation over to the Customer or a designee of the Customer and remain subject to the provisions of Section 9 Confidentiality herein.

9. **CONFIDENTIALITY**

(A) **Business Confidential Information** - Neither party may use "Business Confidential Information" (as defined below) of the other party for its own purpose, nor disclose any Business Confidential Information to any third party. However, a party may disclose Business Confidential Information to that party's representatives who have a need to know such information in relation to the administration of the Plan, but only if such representatives are informed of the confidentiality provisions of this Agreement and agree to abide by them. The Customer shall not disclose Aetna's provider discount or payment information to any third party, including the Customer's representatives, without Aetna's prior written consent and until each recipient has executed a confidentiality agreement reasonably satisfactory to Aetna. In addition to the confidentiality provisions required by Aetna herein, Aetna agrees to incorporate specific policies to protect Customer Business Confidential Information from Aetna employees or agents who compete with Customer products in its service area.

The term "**Business Confidential Information**" as it relates to the Customer means the Customer identifiable business proprietary products, pricing, rates, fees, data, procedures, materials, lists and systems, but does not include Protected Health Information ("PHI") as defined by HIPAA or other claims-related information.

The term "**Business Confidential Information**" as it relates to Aetna means the Aetna identifiable business proprietary data, rates, fees, provider discount or payment information, procedures, materials, lists and systems.

(B) **Plan Participant Information** - Each party will maintain the confidentiality of Plan Participant-identifiable information, in accordance with applicable law and, as appropriate, the terms of the HIPAA business associate agreement associated with this Agreement. The Customer may identify, in writing, certain Customer or Trust Management Company employees or third parties, who the Plan has authorized to receive Plan Participant-identifiable information from Aetna in connection with Plan administration. Subject to more restrictive state and federal law, Aetna will disclose Plan Participant-identifiable information to the Customer designated employees or third parties. In the case of a third party, Aetna may require execution by the third party of a non-disclosure agreement reasonably acceptable to Aetna. The Customer agrees that it will only request disclosure of PHI to a third party or to designated employees if: (i) it has amended its Plan documents, in accordance with 45 CFR 164.314(b) and 164.504(f)(2), so as to allow the Customer designated employees or third parties to receive PHI, has certified such to the Plan in accordance with 45 CFR 164.504(f)(2)(ii), and will provide a copy of such certification to Aetna upon request; and (ii) the Plan has

determined, through its own policies and procedures and in compliance with HIPAA, that the PHI that it requests from Aetna is the minimum information necessary for the purpose for which it was requested.

(C) **Upon Termination** - Upon termination of the Agreement, each party, upon the request of the other, will return or destroy all copies of all of the other's Business Confidential Information in its possession or control except to the extent such Business Confidential Information must be retained pursuant to applicable law or cannot be disaggregated from Aetna's databases. Aetna may retain copies of any such Business Confidential Information it deems necessary for the defense of litigation concerning the Services it provided under this Agreement, for use in the processing of runoff claims for Plan benefits, and for regulatory purposes.

## 10. AUDIT RIGHTS

The Customer may, at its own expense except as provided below, audit Plan claim transactions upon reasonable notice to Aetna. The Customer may conduct one audit per year and the audit must be completed within two years of the end of the time period being audited. Audits of any performance guarantees, if applicable, must be completed in the year following the period to which the performance guarantee results apply. Audits must be performed at the location where the Customer's claims are processed which is High Point, North Carolina (primary location) and Aetna will provide reasonable advance notice to Customer if this is changed or a secondary location for performing audits is added.

Except as provided below, Aetna is not responsible for paying customers' audit fees or the costs associated with an audit. Aetna will bear its own expenses associated with an audit; provided (i) the on-site portion of the audit is completed within five days, and (ii) the sample size is no more than 250 claims. Aetna will notify the Customer prior to the audit, if an audit request would require an additional payment from the Customer for any audits in excess of the aforementioned thresholds.

[REDACTED]

The Plan document will be the document of record with respect to audits.

The Customer may select its own representative to conduct an audit, provided that the representative must be qualified by appropriate training and experience for such work and must perform the audit in accordance with published administrative safeguards or procedures and applicable law. In addition, the representative must not be subject to an Auditor Conflict of Interest which would prevent the representative from performing an independent audit. An "Auditor Conflict of Interest" means any situation in which the designated representative (i) is employed by an entity which is a competitor of Aetna, (ii) has terminated from Aetna or any of its affiliates within the past 12 months, or (iii) is affiliated with a vendor subcontracted by Aetna to adjudicate claims. If the audit firm is not licensed or a member of a national professional group, or if the audit firm has a financial interest in audit findings or results, the audit agent must agree to meet Aetna's standards for professionalism by signing Aetna's Agent Code of Conduct prior to performing the audit. Neither the Customer nor its representative may make or retain any record of provider negotiated rates or information concerning treatment of drug or alcohol abuse, mental/nervous, HIV/AIDs or genetic markers.

The Customer shall provide reasonable advance notice of its intent to audit and shall complete an Audit Request Form providing information reasonably requested by Aetna. No audit may commence until the Audit Request

Form is completed and executed by the Customer, the auditor and Aetna. Further, the Customer or its representative shall provide Aetna with a complete listing of the claims chosen for audit at least four weeks prior to the on-site portion of the audit.

The Customer's auditors shall provide their draft audit findings to Aetna, prior to issuing the final report. This draft will provide the basis for discussions between Aetna and the auditors to resolve and finalize any open issues. Aetna shall have a right to review the auditor's final Audit Report, and include a supplementary statement containing information and material that Aetna considers pertinent to the audit.

## 11. RECOVERY OF OVERPAYMENTS

Aetna shall reprocess any identified errors in Plan benefit payments (other than errors Aetna reasonably determines to be *de minimis*) and seek to recover any resulting overpayment by attempting to contact the party receiving the overpayment twice by letter, phone, or email. The Customer may direct Aetna not to seek recovery of overpayments from Plan Participants, in which event Aetna will have no further responsibility with respect to those overpayments. The Customer shall reasonably cooperate with Aetna in recovering all overpayments of Plan benefits.

**If Aetna elects to use a third party recovery vendor, collection agency, or attorney to pursue the recovery, the overpayment recoveries will be credited to the Customer net of fees charged by Aetna or those entities unless Aetna has breached the standard of care, in which case Aetna will not charge the fees charged by those entities.**

Any requested payment from Aetna relating to an overpayment must be based upon documented findings or direct proof of specific claims, agreed to by both parties, and must be due to Aetna's actions or inactions. Indirect or inferential methods of proof – such as statistical sampling, extrapolation of error rate to the population, etc. – may not be used to determine overpayments. In addition, use of software or other review processes that analyze a claim in a manner different from the claim determination and payment procedures and standards used by Aetna shall not be used to determine overpayments.

When seeking recovery of overpayments from a provider, Aetna has established the following process: if it is unable to recover the overpayment through other means, Aetna may offset one or more future payments to that provider for services rendered to Plan Participants by an amount equal to the prior overpayment. Aetna may reduce future payments to the provider (including payments made to that provider involving the same or other health and welfare plans that are administered by Aetna) by the amount of the overpayment, and Aetna will credit the recovered amount to the plan that overpaid the provider. By entering into this Agreement, the Customer is agreeing that its right to recover overpayments shall be governed by this process and that it has no right to recover any specific overpayment unless otherwise provided for in this Agreement.

The Customer may not seek recovery of overpayments from network providers, but the Customer may seek recovery of overpayments from other third parties once the Customer has provided Aetna notice that it will seek such recovery and Aetna has been afforded a reasonable opportunity to recover such amounts. Aetna has no duty to initiate litigation to pursue any overpayment recovery.

## 12. INDEMNIFICATION

(A) Aetna shall indemnify, hold harmless and defend the Customer, its trustees, its designated Trust Management Company, its affiliates and their respective directors, officers, and employees (only as employees, not as Plan Participants) against any and all causes of action, demands or claims for that portion of any loss, liability, damage, expense, settlement, regulatory fines or penalties, cost or obligation (including reasonable attorneys' fees) ("**Losses**") caused directly by (i) any material breach of this Agreement by Aetna, including a failure to comply with the standard of care in section 3; (ii) Aetna's negligence, willful misconduct, fraud, or breach of fiduciary responsibility; or (iii) Aetna's infringement of any U.S. intellectual property right of a third party, arising out of the Services provided under this Agreement.

(B) The Customer shall indemnify, hold harmless and defend Aetna, its affiliates and their respective directors, officers, and employees against any and all causes of action, demands or claims for that portion of any Losses caused directly by (i) any material breach of this Agreement by the Customer including a failure to comply with the standard of care in section 3; (ii) the Customer's negligence, willful misconduct, fraud, or breach of fiduciary responsibility; (iii) the release or transfer of Plan Participant-identifiable information to the Customer or its designee, or the use or further disclosure of such information by the Customer or such designee; or (iv) in connection with the design or administration of the Plan by the Customer or any acts or omissions of the Customer as an employer or Plan Sponsor.

(C) The party seeking indemnification under this Agreement must notify the indemnifying party within 20 days in writing of any actual or threatened action, to which it claims such indemnification applies. Failure to so notify the indemnifying party will not be deemed a waiver of the right to seek indemnification, unless the actions of the indemnifying party have been prejudiced by the failure of the other party to provide notice as indicated above.

The indemnifying party may join the party seeking indemnification as a party to such proceeding; however the indemnifying party shall provide and control the defense and settlement with respect to claims to which this section applies.

(D) The Customer and Aetna agree that: (i) health care providers are not the agents or employees of the Customer or Aetna and neither party renders medical services or treatments to Plan Participants; (ii) health care providers are solely responsible for the health care they deliver to Plan Participants, and neither the Customer nor Aetna is responsible for the health care that is delivered by health care providers; and (iii) the indemnification obligations of (A) or (B) above do not apply to any portion of any loss relating to the acts or omissions of health care providers with respect to Plan Participants.

(E) These indemnification obligations above shall not apply to any claims caused by (i) an act, or failure to act, by one party at the direction of the other, or (ii) with respect to intellectual property infringement, the Customer's modification or use of the Services or materials that are not contemplated by this Agreement, unless directed by Aetna, including the combination of such Services or materials with services, materials or processes not provided by Aetna where the combination is the basis for the claim of infringement. For purposes of the exclusions in this paragraph, the term "Customer" includes any person or entity acting on the Customer's behalf or at the Customer's direction. For purposes of (A) and (B) above, the standard of care to be applied in determining whether either party is "negligent" in performing any duties or obligations under this Agreement shall be the standard of care set forth in section 3.

Proprietary

## 13. DEFENSE OF CLAIM LITIGATION

In the event of a legal, administrative or other action (including New Jersey's Out of Network Arbitration program) arising out of the administration, processing or determination of a claim for Plan benefits, the party designated in this document as the fiduciary which rendered the decision in the appeal last exercised by the Plan Participant which is being appealed to the court ("appropriate named fiduciary") shall undertake the defense of such action at its expense and settle such action when in its reasonable judgment it appears expedient to do so. ▮▮▮▮▮ If the other party is also named as a party to such action, the appropriate named fiduciary will defend the other party PROVIDED the action relates solely and directly to actions or failure to act by the appropriate named fiduciary and there is no conflict of interest between the parties. The Customer agrees to pay the amount of Plan benefits included in any judgment or settlement in such action. Aetna shall provide Customer copies of any settlement agreements executed on behalf of Customer. The other party shall not be liable for any other part of such judgment or settlement, including but not limited to legal expenses and punitive damages, except to the extent provided in section 12 (Indemnification).

Notwithstanding anything to the contrary in this section 13, in any multi-claim litigation (including arbitration) disputing reimbursement for benefits for more than one Plan Sponsor, the Customer authorizes Aetna to defend and reasonably settle the Customer's benefit claims in such litigation.

In addition to the provisions above, Aetna will work in good faith and will make commercially reasonable efforts to resolve any disputes Aetna or Customer may have with Aetna network providers.

## 14. REMEDIES

Other than in an action between the parties for third party indemnification, neither party shall be liable to the other for any consequential, incidental or punitive damages whatsoever.

## 15. BINDING ARBITRATION OF CERTAIN DISPUTES

Any controversy or claim arising out of or relating to this Agreement or the breach, termination, or validity thereof, except for temporary, preliminary, or permanent injunctive relief or any other form of equitable relief, shall be settled by binding arbitration in Camden, NJ or other location mutually agreed between the parties, administered by the American Arbitration Association ("AAA") and conducted by a sole arbitrator in accordance with the AAA's Commercial Arbitration Rules ("Rules"). The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16, to the exclusion of state laws inconsistent therewith or that would produce a different result, and judgment on the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. Except as may be required by law or to the extent necessary in connection with a judicial challenge, or enforcement of an award, neither a party nor the arbitrator may disclose the existence, content, record or results of an arbitration. Fourteen (14) calendar days before the hearing, the parties will exchange and provide to the arbitrator (a) a list of witnesses they intend to call (including any experts) with a short description of the anticipated direct testimony of each witness and an estimate of the length thereof, and (b) pre-marked copies of all exhibits they intend to use at the hearing. Depositions for discovery purposes shall not be permitted. The arbitrator may award only monetary relief and is not empowered to award damages other than compensatory damages.

## 16. COMPLIANCE WITH LAWS

Aetna and Customer shall each shall comply with all applicable federal and state laws as may be amended, including, without limitation, the Patient Protection and Affordable Care Act of 2010 ("**PPACA**"), the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**"), Medicare, Medicaid and SCHIP Extension Act of 2007 ("**MMSEA**"), and New Jersey Out-of-Network Consumer Protection, Transparency, Cost Containment and Accountability Act and the Employee Retirement Income Security Act of 1974 ("**ERISA**").

The Aetna standard network(s) filed with the state (with the exception of Aetna Whole Health) shall be capable of providing members with access to a full range of covered services and supplies.

## 17. TERMINATION

This Agreement may be terminated by Aetna or the Customer as follows:

**(A) Termination by the Customer** – The Customer may terminate this Agreement as of the date specified in a written notice given by Customer at least thirty (30) days in advance of such date to Aetna in the event that Aetna fails to cure a default of any material obligation or duty imposed on it within thirty (30) days after notice of the default. An ▮▮▮▮▮▮▮ for purposes of Performance Guarantees (as such Guarantees are described in the Performance Guarantees Exhibit 4), shall mean, not meeting ▮▮▮ of the measures for two consecutive calendar quarters.

Customer may terminate this agreement after expiration of Initial Term, as of the date specified in a written notice given by Customer to Aetna at least one hundred eighty (180) days in advance of such date.

**(B) Termination by Aetna and Suspension of Claim Payments-**

(1) Aetna may terminate this Agreement after expiration of the Initial Term, as of the date specified in a written notice given by Aetna to Customer at least one hundred eighty (180) days in advance of such date.

(2) If the Customer fails to fund claim wire requests from Aetna, or fails to pay Service Fees by the Payment Due Date, Aetna has the right to cease paying claims and suspend Services until the requested funds or Service Fees have been provided. Aetna may take action to terminate the Agreement following notice to the Customer if the Customer fails to fund claim wire requests or pay the applicable Service Fees, provided such Service Fees are not in dispute, in full within five business days (for claim wire requests) or ten business days (for Service Fees requests) of written notice by Aetna. Any termination by Aetna pursuant to this section must be done in good faith.

**(C) Legal Prohibition** –

If any jurisdiction enacts a law, or Aetna or Customer reasonably interpret an existing law, to prohibit the continuance of the Agreement or some portion thereof, the Agreement or that portion shall terminate automatically as to such jurisdiction on the effective date of such law or interpretation; provided, however, if only a portion of the Agreement is impacted, the Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

(D) **Responsibilities on Termination** –

Upon termination of the Agreement, for any reason other than default of payment by the Customer, the Customer may request that Aetna continue processing runoff claims for Plan benefits that were incurred prior to the termination date, which are received by Aetna within ▉▉▉▉ following the termination date. In such event, the parties shall mutually agree upon a fee for such runoff services, which shall be paid by the Customer prior to the commencement of the runoff services (such fee is not applicable if the Customer terminates the Agreement effective on or after January 1, 2025). Runoff claims will be processed and paid in accordance with the terms of this Agreement. New requests for benefit payments received after the 12 month runoff period will be returned to the Customer or to a successor administrator at the Customer's expense. Claims which were pended or disputed prior to the start of the runoff period will be handled to their conclusion by Aetna, as well as provider performance or incentive payments paid for prior period performance pay outs, and Customer agrees to fund such claims or payments when requested by Aetna.

The Customer shall continue to fund Plan benefit payments and agrees to instruct its bank to continue to make funds available until all outstanding Plan benefit payments have been paid or until such time as mutually agreed upon by Aetna and the Customer. The Customer's wire line and bank account from which funds are requested must remain open for ▉▉▉▉ after runoff processing ends, or ▉▉▉▉ after termination.

Upon termination of the Agreement and provided all Service Fees have been paid, Aetna will release to the Customer, or its successor administrator, all claim data in Aetna's standard format, and other data/records as Customer may reasonably require, within a reasonable time period following the termination date. All costs associated with the release of such data shall be paid by the Customer.

## 18. GENERAL

(A) **Relationship of the Parties** - The parties to this Agreement are independent contractors. This Agreement is not intended and shall not be interpreted or construed to create an association, agency, joint venture or partnership between the parties or to impose any liability attributable to such a relationship. Each party shall be solely responsible for all wages, taxes, withholding, workers compensation, insurance and any other obligation on behalf of any of its employees, and shall indemnify the other party with respect to any claims by such persons.

(B) **Intellectual Property** - Aetna represents that it has either the ownership rights or the right to use all of the intellectual property used by Aetna in providing the Services under this Agreement (the "**Aetna IP**"). Aetna has granted the Customer a nonexclusive, non-assignable, royalty free, limited right to use certain of the Aetna IP for the purposes described in this Agreement. Customer agrees not to modify, create derivative product from, copy, duplicate, decompile, disassemble, reverse engineer or otherwise attempt to perceive the source code from which any software component of the Aetna IP is compiled or interpreted. Nothing in this Agreement shall be deemed to grant any additional ownership rights in, or any right to assign, sublicense, sell, resell, lease, rent or otherwise transfer or convey, the Aetna IP to the Customer. Customer represents that it has either the ownership rights or the right to use all of the intellectual property it provides to Aetna for purposes of providing the Services under this Agreement (the "**Customer IP**"). Customer has granted Aetna a nonexclusive, non-assignable, royalty free, limited right to use certain of the Customer IP for the purposes described in this Agreement. Aetna agrees not to modify, create derivative product from, copy, duplicate, decompile, disassemble, reverse engineer or otherwise attempt to perceive the source code from which any software component of the Customer IP is compiled or interpreted. Nothing in this Agreement shall be deemed to grant any additional ownership rights in, or any right to assign, sublicense, sell, resell, lease, rent or otherwise transfer or convey, the Customer IP to Aetna. The parties agree that any materials created for Customer by Aetna on a wholly owned custom basis (unique to Customer's business, for a specific fee) are consider(ed) work for hire and all rights to derived data and materials resulting therefrom are retained by the Customer, subject to those portions thereof which represent Aetna IP.

(C) **Communications** - Aetna and the Customer may rely upon any communication believed by them to be genuine and to have been signed or presented by the proper party or parties. For a notice or other communication under this Agreement to be valid, it must be in writing and delivered (i) by hand, (ii) by e-mail or (iii) by fax to a representative of each party as mutually agreed upon. Notices or communications may also be sent by U.S. mail to the address below.

| If to Aetna: | If to the Customer: |
|---|---|
| Aetna – APEMT Account Team<br>9 Entin Road, 2nd Floor<br><br>Parsippany, NJ 07054<br>Attn: Senior Account Executive | Affiliated Physicians and Employers Master Trust<br>C/O Concord Management Resources<br>399 Campus Drive, Suite 300<br>Somerset, NJ 08873<br>Attn: Chief Executive Officer<br><br>With a Copy to:<br><br>Megna Law Firm<br>24 Arnett Avenue, Suite 115<br>Lambertville, NJ 08530 |

All notices, demands, requests, or other communication hand-delivered or mailed in accordance with this Section shall be effective as of the date when actually received by the party to whom such notice, demand, request or other communication is addressed.

(D) **Force Majeure** – With the exception of the Customer's obligation to fund benefit payments and Service Fees, neither party shall be deemed to have breached this Agreement, or be held liable for any failure or delay in the performance of any portion of its obligations under this Agreement, including performance

guarantees if applicable, if prevented from doing so by a cause or causes beyond the reasonable control of the party. Such causes include, but are not limited to: acts of God; acts of terrorism; pandemic; fires; wars; floods; storms; earthquakes; riots; labor disputes or shortages; and governmental laws, ordinances, rules, regulations, or the opinions rendered by any court, whether valid or invalid.

(E) **Governing Law** - The Agreement shall be governed by and interpreted in accordance with applicable federal law, including ERISA. To the extent such federal law does not govern, the Agreement shall be governed by New Jersey law.

(F) **Financial Sanctions** – If Plan benefits or reimbursements provided under this Agreement violate or will violate any economic or trade sanctions, such Plan benefits or reimbursements are immediately considered invalid. Aetna cannot make payments for claims or Services if it violates a financial sanction regulation. This includes sanctions related to a blocked person or a country under sanction by the United States, unless permitted under a written office of Foreign Assets Control (OFAC) license.

(G) **Waiver** - No delay or failure of either party in exercising any right under this Agreement shall be deemed to constitute a waiver of that right.

(H) **Third Party Beneficiaries** - There are no intended third party beneficiaries of this Agreement.

(I) **Severability** – If any provision of this Agreement or the application of any such provision to any person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement and all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect.

(J) **Entire Agreement; Order of Priority** - This Agreement (including the following listed Schedules, Exhibits and Addenda), constitutes the entire understanding between the parties with respect to the subject matter of this Agreement, and supersedes all other agreements, whether oral or written, between the Parties.

**Name of Schedule, Exhibit or Addendum:**

- Medical Service and Fee Schedule
- General Administration and Medical Services Schedule
- Summary Plan Description (attached as Exhibit 1)
- HIPAA Business Associate Agreement (attached as Exhibit 2)
- Letter of Understanding (attached as Exhibit 3)
- Performance Guarantees (attached as Exhibit 4)
- Claim Target Guarantee (attached as Exhibit 5)
- Aetna Whole Health Cost of Care Reconciliation (attached as Exhibit 6)
- Escheat Election Form, i.e. Customer Election Page (attached as Exhibit 7)
- Limited Uses of Aetna Marks (attached as Exhibit 8)
- Items To Which Customer Logo May Be Added (attached as Exhibit 9)

If there is a conflict between Master Services Agreement and the above named documents, the above named documents will prevail. The prevailing documents for subjects not addressed in the Master Services Agreement will be those named above.

(K) **Amendment** – No modification or amendment of this Agreement will be effective unless it is in writing and signed by both Parties, except that a change to a party's address of record as set forth in section 18(C) (Communications) may be made without being countersigned by the other party.

(L) **Taxes** – The Customer shall be responsible for any sales, use, or other similarly assessed and administered tax (and related penalties) incurred by Aetna by reason of Plan benefit payments made or Services performed hereunder, and any interest thereon. Additionally, if Aetna makes a payment to a third party vendor at the request of the Customer, Aetna will assume the tax reporting obligation, such as Form 1099-MISC or other applicable forms. Aetna will remit for HCRA and any other applicable state assessments on Customer's behalf.

(M) **Assignment** - This Agreement may not be assigned by either party without the written approval of the other party. The duties and obligations of the parties will be binding upon, and inure to the benefit of, successors, assigns, or merged or consolidated entities of the parties.

(N) **Survival** - Sections 5, 8 through 13 and 17(D) shall survive termination of the Agreement.

(O) **Subcontractors** -The work to be performed by Aetna under the Agreement may, at its discretion, be performed directly by it or wholly or in any part through a subsidiary, an affiliate, or under a contract with an organization of its choosing. Aetna will remain liable for Services under the Agreement. Upon request, Aetna shall provide a written list of Tier 1 subcontractors to the Customer. Tier 1 subcontractors are defined as a subset of Aetna suppliers for whom a portion of the Services provided may include direct Plan Participant contact or significant access to Plan Participant-identifiable data. Not all Aetna suppliers on the list provided are utilized in providing services to all customers or plan participants. Upon reasonable request every six months, Aetna shall make an updated Tier 1 subcontractor list available to the Customer for informational purposes. For the avoidance of doubt, neither Aetna's obligation to provide, nor the Customer's right to receive a Tier 1 subcontractor list under this paragraph, shall constitute a right of the Customer to pre-approve any Aetna subcontractor or a right to require Aetna to terminate any agreements (or services under any agreements) with any Aetna supplier.

Aetna or its subcontractors will access the Customer or Plan Participant data from locations outside of the jurisdiction of the United States; provided that such access (i) is limited to screen viewing of the data, which shall, at all times, remain physically stored in the United States, and (ii) is subject to security controls, including limiting such access to devices with no download, print or storage capability.

(P) **Counterparts** – This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(Q) **SOC 1**- Aetna shall provide on annual basis a copy of its most recent SOC-1 upon request.

(R) **MEWA** - The Customer is a New Jersey licensed Multiple Employer Welfare Arrangement (MEWA) as defined by subsection (40) of 29 **U.S.C.** 1002 and **N.J.S.A.** 17B:27C – 3 that provides health benefit plans to employer members and their eligible dependents.

(S) **Cooperation With Governmental Audits** - As a MEWA, Customer is subject to regulation by the New Jersey Department of Banking and Insurance and the United States Department of Labor. Both governmental entities conduct regular and periodic audits of the Customer. To comply with these audits, Customer will need to secure

various documents, reports, information and data from Aetna. Aetna agrees to reasonably cooperate with Customer to provide such materials to comply with all state and federal audit requests.

**(T) Insurance** - Without limiting or diminishing Aetna's obligation in Section 12 (Indemnification) to indemnify Customer, Aetna shall procure and maintain policies of comprehensive general liability insurance, workers' compensation insurance (with EPLI coverage) and other insurance, including errors and omissions insurance, cybersecurity insurance (to also HIPAA breach), and such other protections as shall be commercially reasonable to fully insure Aetna against the risks of the conduct of its business under this Agreement. Upon reasonable request by Customer, Aetna shall provide to Customer evidence of such coverages, which shall specify (i) coverage amounts, (ii) deductibles, (iii) insurance company, (iv) name, address, and telephone number of the agent or broker, and (v) policy number for each insurance policy to which Aetna is a party, the named insured or otherwise the beneficiary of coverage.

**(U) Co-Marketing** – The parties shall work in good faith to co-market Aetna products and services that shall allow the Customer to differentiate its offering and the brand it markets. It may involve additional charges at such terms as mutually agreed to in writing by the parties.

**SIGNATURE PAGE FOLLOWS**

The parties are signing this agreement as of the date stated in the introductory clause.

**AFFILIATED PHYSICIANS AND EMPLOYERS MASTER TRUST**

By: _[signature]_

Name: Lawrence Downs

Title: APEMT Board President

**AETNA LIFE INSURANCE COMPANY:**

By: _Karen S. Lynch [signature]_

Name: Karen S. Lynch

Title: President – Aetna Life Insurance Company

Financial Verification

By: _Jeffrey M. Patras [signature]_

Name: Jeffrey M. Patras

Title: Director, Underwriting

Proprietary