| |  |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY**<br>Caption in Compliance with D.N.J. LBR 9004-2(c)<br>**GENOVA BURNS LLC**<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ  07920<br>Phone: (973) 467-2700<br>Fax: (973) 467-8126<br>*Proposed Counsel to Affiliated Physicians and Employers Master Trust*<br>**DANIEL M. STOLZ, ESQ.**<br>**DONALD W. CLARKE, ESQ.** | |
| In Re:<br><br>**AFFILIATED PHYSICIANS AND EMPLOYERS MASTER TRUST d/b/a MEMBER HEALTH PLAN NJ**<br><br>Debtor. | Chapter 11<br><br>Hon. Michael B. Kaplan<br><br>Case No.: 21-14286-MBK |

# DECLARATION OF LAWRENCE DOWNS IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS

LAWRENCE DOWNS, being of full age and having been duly sworn according to law, hereby declares as follows:

1. I currently serve as the Chairman of the Board of Affiliated Physicians and Employers Master Trust (hereinafter "APEMT").

2. I also serve as the Chief Executive Officer of the Medical Society of New Jersey, the largest organization of physicians in the state.

3. I am a graduate of Rutgers University School of Law - Camden, and am an attorney admitted to practice in the State of New Jersey.

4. The Affiliated Physicians and Employers Master Trust ("APEMT") is a self-funded multiple employer welfare arrangement under the provisions of N.J.S.A. 17B:27C-1, et seq. (the "MEWA") and is registered with the New Jersey Department of Banking and Insurance annually.

The MEWA is also registered as a MEWA with the United States Department of Labor, through an annual M1 filing. The MEWA was approved in 2004 and began operations shortly thereafter.

5. As of May 2019, APEMT serviced more than 3,500 employer groups that covered approximately 35,800 covered lives (employees and their defendants). The employers being serviced are made up of an estimated 25% of healthcare businesses (i.e. doctor's offices, pharmacies, clinics, nursing homes, long term care facilities, etc.).

6. It is estimated that 95% of the COVID-19 in-patient admissions of covered employees have come from what New Jersey Law defines as "essential workers." It is estimated that at least 80% of the covered employees of the APEMT meets the definition of essential workers. These estimates are based on information provided by the Debtor's actuaries and management.

7. APEMT offers medical, dental and prescription benefits to members of its sponsoring associations ("Members"). Currently, the APEMT has approximately 26,734 Members, 25% of which are healthcare providers.

8. The APEMT has no direct employees, only Trustees. There are currently 11 Trustees for the APEMT, a number of whom are physicians and all of whom represent members of the APEMT.

9. All financial and operational issues of the APEMT are handled by Concord Management Resources ("Concord") who has been employed in this capacity since December 1, 2017. Prior to that date, QualCare, Inc., a Cigna Company, handled the financial and operational aspects of the APEMT. The same staff that was handling the affairs of APEMT at QualCare, are currently handling the affairs of APEMT at Concord.

10. Because APEMT has no direct employees, nor a lease of a premises, APEMT was

not eligible for the Federal COVID-19 relief programs, including PPP loans. To date, State COVID-19 relief funds have also been unavailable to APEMT.

11. The gross revenue of APEMT in 2019 was $219,919,417.00. The total gross revenue in 2020 was $222,598,793.00.

12. The full Board of Trustees meets on a quarterly basis, or more frequently as needed. The Board of Trustees has created an executive and finance committee, which is very involved in all health plan decisions. The committee is responsible for making sure that all of the duties and responsibilities that are required to be performed by APEMT are performed by persons or entities possessing the appropriate expertise and competencies for their respective duty. The committee meets on a monthly basis, but often much more frequently.

13. Aetna serves as the third party administrator for the APEMT. Aetna handles medical and prescription claims administration, claims processing, processing of checks and other receipts, benefit plan maintenance, and HIPAA administration.

14. The APEMT also utilizes the services of Windsor Strategy Partners as actuaries. Windsor works with APEMT on rate setting and DOBI rate filings, monthly analysis for financial reporting, annual reserve opinions and certifications, and audit support for the external auditors.

15. APEMT's external auditors are the accounting firm of Withum, Smith & Brown, P.C.

16. Through various entities, APEMT maintains directors' and officers' insurance, fiduciary insurance, crime and cyber insurance, errors and omissions insurance, and stop loss employee insurance.

17. APEMT was formed pursuant to a Master Trust Agreement. The Master Trust Agreement was amended and restated as of March 22, 2018 (the "Master Trust Agreement").

18. Pursuant to the Master Trust Agreement, employer members are required to make contributions sufficient at all times to maintain a contributed reserve in the amounts which the Trustees or Windsor determine are appropriate and necessary. Pursuant to the Master Trust Agreement and applicable New Jersey Law, employers that participate in a MEWA remain individually, severally and proportionately liable for any financial deficiency that may arise in the event that the MEWA is unable to meet its financial obligations to claimants and/or medical service providers, or as directed by an appropriate governmental department, commission or agency, or order of the court. Each employer Member was required to sign a participation contract acknowledging this contingent liability.

19. As of June 30, 2020, APEMT maintained sufficient statutory reserves of $15,480,436.

20. In late November 2020, Concord determined, after finalizing the October 2020 financials, that APEMT was going to be below the required risk based capital level, as of October 31, 2020. Upon being informed of the foregoing, APEMT's Board evaluated options and determined that the best option that would allow APEMT to continue operating with the least impact on its 35,000 enrollees was to pursue capital resources to shore up the capital of APEMT. Other options were considered, including assessing membership for the shortfall.

21. The main contributing factor to APEMT's surplus depletion was the COVID-19 pandemic and the timing of the outbreak. APEMT had just held its rate flat for its July 2019, October 2019, and January 2020 renewals in anticipation of the transition to Aetna providing third party administration. The estimates that APEMT received from its consultants were that the Aetna discounts and improved medical management would yield 8% in savings, offset by 1% in administrative fees, for a net 7% expense reduction.

22. In addition to the transition to Aetna's administration services, the APEMT applied a 5.5% COVID-19 surcharge beginning February 1, 2021 to help resolve the capital shortfall.

23. In the first quarter of 2020, APEMT began to see the results of these improvements.

24. Furthermore, claims for the first quarter of 2020 began to level out and reduce, and were 15.1% below the 2019 year average.  During the months of April, May and June 2020, claims reduced further as a result of the COVID-19 shutdown of the State of New Jersey.

25. Unfortunately in July of 2020, claims rose to the highest level APEMT had ever seen. Claims have continued at this level and have not subsided.

26. As most of APEMT's Members and employers are essential workers, the claims related to COVID-19 submitted to APEMT are much higher than those in other segments of the population.  For example, nursing homes, assisted living facilities, hospice facilities, and senior living facilities submitted thousands of claims for COVID-19 tests.

27. In addition to the foregoing, APEMT was advised by Aetna in March 2020 that Aetna was requiring its clients to cover all telemedicine visits, whether COVID-19 related or not, at 100%, with no member cost share.  The foregoing resulted in unanticipated expense by APEMT of in excess of $1 million.

28. Another unanticipated hit to APEMT's cash flow was a HIT tax payment asserted to be due from APEMT, including a $3.27 million assessment in August of 2020.

29. APEMT believes that MEWA's were arbitrarily added to the HIT tax law and should not have been subject to this tax.  APEMT obtained a legal opinion from an attorney who was involved in drafting the legislation, who believes that APEMT has a solid case if it wishes to take this matter to tax court.  APEMT has paid more than $11 million in HIT tax payments since the ACA was enacted.

30. During the week of November 29, 2020, representatives of APEMT contacted DOBI to request guidance concerning the financial condition of its Members. A meeting with DOBI was held on December 4, 2020 to discuss the situation.

31. On December 9, 2020, DOBI issued a letter documenting DOBI's request for a Corrective Action Plan on or before January 7, 2021. DOBI required the deficiency to be cured within 90 days.

32. During the months of January, February, March, April and May of 2021, APEMT has been in frequent communication with DOBI. Prior to this bankruptcy filing, we obtained a $5 million commitment for a capital contribution from Aetna (subject to the approval of DOBI), which we presented to DOBI. DOBI advised that the $5 million funding from Aetna would not comply, as it was a debt agreement that increased the liabilities of APEMT and did not positively impact the reserves.

33. By letter dated May 6, 2021, DOBI advised that it continued to assert that the financial condition of APEMT remained inadequate. DOBI requested the APEMT surrender its Certificate of Registration, immediately cease writing new business, and provide DOBI with a plan to minimize the impacts on its Members going forward.

34. Thousands of employer Members and their employees rely upon APEMT to provide medical, prescription, and dental coverage. Since DOBI's May 6, 2021 letter, the Board of Trustees and the retained consultants have worked feverishly to explore alternatives. There is some hope that outside funding will become available to provide APEMT with sufficient reserves for it to continue to operate and provide services to its members and their employees. After considering alternatives, it was determined that the filing of a Chapter 11 petition for reorganization was the best step available for APEMT, and its Members and covered employees

to move forward.

35.     APEMT has been advised by Concord and our actuaries, that, if APEMT continues to operate, the projected underfunding is in the range of $6-7 Million. If APEMT is forced to cease operations, the underfunding will be 3 to 4 times larger.

36.     If APEMT was forced to cease operations, we would be forced to assess proportionate liability for the underfunding against the employer members. This would drive many employer members out of business, result in the loss of jobs and other severe economic impact. It would also cast almost 27,000 covered employees adrift without health coverage.

37.     The Trustees look forward to working with this Court and all interested parties to reach the most favorable result possible in this unfortunate situation.

38.     I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

                                           */s/   Lawrence Downs*          .
                                           LAWRENCE DOWNS