| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY**<br>Caption in Compliance with D.N.J. LBR 9004-2(c)<br>**GENOVA BURNS LLC**<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ  07920<br>Phone: (973) 467-2700<br>Fax: (973) 467-8126<br>*Counsel to Affiliated Physicians and Employers Master Trust d/b/a Member Health Plan NJ*<br>**DANIEL M. STOLZ, ESQ.**<br>**DONALD W. CLARKE, ESQ.** | |
| In Re:<br><br>**AFFILIATED PHYSICIANS AND EMPLOYERS MASTER TRUST D/B/A MEMBER HEALTH PLAN NJ**<br><br>                      Debtor. | Chapter 11<br><br>Hon. Michael B. Kaplan<br><br>Case No.: 21-14286-MBK |
| **AFFILIATED PHYSICIANS AND EMPLOYERS MASTER TRUST D/B/A MEMBER HEALTH PLAN NJ**<br><br>                      Plaintiff,<br>v.<br><br>**DEPARTMENT OF TREASURY, INTERNAL REVENUE SERVICE**<br><br>                      Defendant. | Adv. Pro. No.: 21-_____-MBK |

## COMPLAINT

Affiliated Physicians and Employers Master Trust d/b/a Member Health Plan NJ (hereinafter "APEMT" or "Plaintiff"), by and through its counsel, Genova Burns, LLC, alleges as follows:

## JURISDICTION

1.    This adversary proceeding arises in case no. 21-14286-MBK, now pending before the United States Bankruptcy Court for the District of New Jersey (the "Court").

2. The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b), 1334(b), 2201 and other applicable provisions of federal law.

3. This adversary proceeding is a core proceeding as that term is defined in 28 U.S.C. §157(b)(2)(A), (C), (E), (H), and (O).

4. Venue of this adversary proceeding in this district is proper under 28 U.S.C. §1409.

## BASIS FOR RELIEF

5. The statutory basis for the relief requested is sections 105(a), 505(a), 542, 544, 548, and 550 of the Bankruptcy Code and Bankruptcy Rule 7001.

6. No prior adjudication for the relief requested has been made by this or any other court of competent jurisdiction pursuant to 11 U.S.C. § 505(a)(2)(B).

7. 28 U.S.C. § 2201 provides: "In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than ... a proceeding under section 505 … of title 11 ..., any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

## PARTIES AND BACKGROUND

8. On May 24, 2021, the Plaintiff filed a voluntary petition for relief under chapter 11, subchapter V of the United States Bankruptcy Code (the "Petition Date").

9. The Plaintiff, a debtor-in-possession in the above bankruptcy case, is a non-profit, self-funded multiple employer welfare arrangement ("MEWA") under the provisions of 29 U.S.C. Ch. 18 (the "Employee Retirement Income Security Act") and N.J.S.A. 17B:27C-1, et

seq. (the "Self-Funded Multiple Employer Welfare Arrangement Regulation Act"), and is registered with the New Jersey Department of Banking and Insurance ("NJ DOBI") annually.

10. The Department of Treasury, Internal Revenue Service (the "IRS" or "Defendant"), is the federal government agency collecting taxes on behalf of the United States of America, with an address for notices listed on the proof of claim filed in this case (claim no. 2-1, filed June 17, 2021) of P.O. Box 7346, Philadelphia, PA, 19101-7346, and a physical address of 51 Haddonfield Road, Ste. 300, Cherry Hill, NJ 08002.

11. In addition to registering with NJ DOBI, the Plaintiff is also registered as a MEWA with the United States Department of Labor ("US DOL"), through an annual M1 filing.

12. The Plaintiff was approved by both NJ DOBI and US DOL in 2004 and began operations shortly thereafter.

13. As of May 2019, APEMT serviced more than 3,500 employer groups that covered approximately 35,000 covered lives (employees and their dependents). The employers being serviced are made up of an estimated 25% of healthcare businesses (i.e. doctor's offices, pharmacies, clinics, nursing homes, long term care facilities, etc.).

14. It is estimated that 95% of the COVID-19 in-patient admissions of covered employees have come from what New Jersey Law defines as "essential workers." It is estimated that at least 80% of the covered employees of the APEMT meets the definition of essential workers. These estimates are based on information provided by the APEMT's actuaries and management.

15. APEMT offers medical, dental and prescription benefits to members of its sponsoring associations ("Members"). As of the Petition Date, the APEMT had approximately 26,734 Members, 25% of which are healthcare providers.

16. The APEMT has no direct employees, only Trustees. There are currently 11 Trustees for the APEMT, a number of whom are physicians and all of whom represent sponsoring associations of APEMT.

17. All financial and operational issues of the APEMT are handled by Concord Management Resources ("Concord") who has been employed in this capacity since December 1, 2017. Prior to that date, QualCare, Inc., a Cigna Company, handled the financial and operational aspects of the APEMT. The same staff that was handling the affairs of APEMT at QualCare, are currently handling the affairs of APEMT at Concord.

18. Because APEMT has no direct employees, nor a lease of any premises, APEMT was not eligible for the Federal COVID-19 relief programs, including PPP loans. To date, State COVID-19 relief funds have also been unavailable to APEMT.

19. Aetna serves as the third-party administrator for the APEMT. Aetna handles medical and prescription claims administration, claims processing, processing of checks and other receipts, benefit plan maintenance, and HIPAA administration.

20. APEMT was formed pursuant to a Master Trust Agreement. The Master Trust Agreement was amended and restated as of March 22, 2018 (the "Master Trust Agreement").

21. Pursuant to the Master Trust Agreement, employer members are required to make contributions sufficient to maintain a contributed reserve in the amounts which the Trustees, with guidance from APEMT's outside actuaries, determine are appropriate, necessary, and consistent with state statute.

22. As of June 30, 2020, APEMT maintained sufficient statutory reserves of $15,480,436.

23. In late November 2020, Concord determined, after finalizing the October 2020

4

financials, that APEMT was going to be below the required risk-based capital level, as of October 31, 2020.

24. The main contributing factor to APEMT's surplus depletion was the COVID-19 pandemic and the timing of the outbreak.

25. In July of 2020, claims rose to the highest level APEMT had ever seen. Claims have continued at this level and have not subsided.

26. As most of the employees of APEMT's Members are essential workers, the claims related to COVID-19 submitted to APEMT are much higher than those in other segments of the population. For example, nursing homes, assisted living facilities, hospice facilities, and senior living facilities submitted thousands of claims for COVID-19 tests.

27. In addition to the foregoing, APEMT was advised by Aetna in March 2020 that Aetna was requiring its clients to cover all telemedicine visits, whether COVID-19 related or not, at 100%, with no member cost share. The foregoing resulted in unanticipated expense by APEMT of in excess of $1 million.

### *The Department of Treasury's Arbitrary and Capricious Decision to Require Self-Insured MEWAs to Make Health Insurance Tax Payments, Contrary to Congressional Intent*

28. Another unanticipated blow to APEMT's cash flow was a health insurance tax payment ("HIT Payment") assessed against the Plaintiff by the Defendant, including a $3.27 million assessment in August of 2020.

29. APEMT has paid $8,891,397.32 in annual HIT Payments since 2015. A schedule of Plaintiff's HIT Payments is attached as **Exhibit "A."**

30. Enacted as part of the PATIENT PROTECTION AND AFFORDABLE CARE ACT (the "ACA"), PL 111-148, March 23, 2010, 124 Stat. 119, Congress developed HIT Payments to recoup profits that commercial health insurance companies would generate from the

5

sale of government-subsidized commercial health plans.

31. Unlike for-profit commercial insurance companies, self-insured MEWAs – including the APEMT – are non-profit entities. In addition, the type of health plan coverage that is offered through a self-insured MEWA is not eligible to be purchased with a government subsidy under the ACA.

32. Despite the fact that (1) APEMT is a non-profit entity and (2) APEMT does not benefit in any way from the government subsidies available under the ACA, the Department of Treasury ("Treasury"), when developing implementing regulations for HIT Payments, arbitrarily decided to require self-insured MEWAs – like the APEMT – to make HIT Payments, contrary to Congressional intent.

33. Congress did not intend for self-insured MEWAs – like APEMT – to make HIT Payments, which is evidenced by a number of the provisions that Congress included in the ACA. *King v. Burwell,* 576 U.S. 473, 486, 135 S. Ct. 2480, 2489, 192 L. Ed. 2d 483 (2015) (Supreme Court explained that the ACA should be read as a whole, and when there are indications of Congressional intent in certain parts of the statute, this intent can be carried forward when interpreting other parts of the ACA.).

34. In ACA section 9010 (the section of the ACA governing HIT Payments), Congress neither listed a self-insured MEWA as an entity required to make HIT Payments, nor specifically excepted self-insured MEWAs from the HIT Payment requirement. However, Congress's silence should not be construed as an indication that self-insured MEWAs are required to make HIT Payments, especially based on other provisions that Congress added to the ACA under which Congress was explicit on how self-insured MEWAs should be treated under the law.

35. In ACA section 1301(b)(1)(B), Congress explicitly stated that a self-insured

6

MEWA is not a commercial health plan sold by for-profit commercial health insurance companies, providing that a "Qualified Health Plan" (which is the only type of health plan that is eligible for a government subsidy under the ACA) does not include a self-insured MEWA.

36. In Internal Revenue Code ("IRC") section 4375 (which was added to the IRC by the ACA), Congress imposed a tax on commercial health insurance companies to fund the Patient Centered Organization Research Institute ("PCORI"). Congress also added section 4376 to the IRC (through the ACA), explicitly imposing the same tax on self-insured MEWAs to fund the PCORI.

37. If Congress wanted self-insured MEWAs to make HIT Payments, Congress would have said so explicitly, but Congress did not, providing clear evidence that Treasury acted arbitrarily and capriciously when requiring self-insured MEWAs – like APEMT – to make HIT Payments through implementing regulations.

38. For-profit commercial health insurance companies make HIT Payments from their profits. As a non-profit entity, self-insured MEWAs make HIT Payments from the MEWA's "plan assets." The Employee Retirement Income Security Act ("ERISA") governs self-insured MEWAs, and ERISA includes specific rules on how ERISA-covered plans – like self-insured MEWAs – may use their "plan assets." ERISA provides that "plan assets" may only be used to pay for health claims incurred by participants of the plan, and also the plan's administrative costs.

39. By making HIT Payments to the IRS, a self-insured MEWA is violating ERISA's requirements because HIT Payments are not payments for health claims incurred by participants, nor are they payments to cover administrative costs.

40. Making HIT Payments to the IRS also depletes a self-insured MEWA of its own

7

"plan assets" that are otherwise required to be used to pay for health claims incurred by participants, which negatively impacts the MEWA's long-term solvency, which in turn could result in plan participants losing their health plan coverage, a result that Congress would have never intended.

## COUNT I

### *DECLARATION, PURSUANT TO BANKRUPTCY CODE SECTION 505, THAT APEMT IS NOT A COVERED ENTITY, AND SHOULD NOT HAVE BEEN ASSESSED ANY TAX LIABILITY FOR HIT PAYMENTS*

41. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 40 of this Complaint and makes the same a part hereof as if more fully set forth herein.

42. 28 U.S.C. § 2201 provides: "In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than ... a proceeding under section 505 or 1146 of title 11 ..., any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

43. Pursuant to section 505(a)(1), a bankruptcy court has complete discretion to determine a debtor's liability for any tax. The exceptions to a bankruptcy court's power and authority to determine a debtor's tax liability, enumerated in subsections 505(a)(2)(A)-(C) of the Bankruptcy Code, are inapplicable here. Thus, this Court has the power and authority to determine the legality of the Treasury's arbitrary and capricious decision to require self-insured MEWAs – like the APEMT – to make HIT Payments, contrary to Congressional intent.

44. This Court's exercise of authority to determine the Debtor's tax liability and right to recover the HIT Payments is warranted under the circumstances.

8

**WHEREFORE**, the Plaintiff demands a judgment declaring that the Plaintiff is not a "covered entity" which should have been assessed a HIT Payment under the ACA, and for such other relief as the Court deems just and equitable.

## COUNT II

*Turnover of Estate Property Under 11 U.S.C. § 542(a)*

45. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 44 of this Complaint and makes the same a part hereof as if more fully set forth herein.

46. Bankruptcy Code section 542(a) provides, in pertinent part, that "an entity, . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under § 363 of this title, . . . shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a).

47. Bankruptcy Code section 541(a) provides, in pertinent part, that the bankruptcy estate is comprised, among other things, of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a).

48. Plaintiff's interest in the tax refund or recovery described herein constitutes property of the estate as of the Petition Date pursuant to § 541(a).

49. Accordingly, pursuant to § 542(a) of the Bankruptcy Code, Plaintiff requests that the Court enter an order directing the Defendant to turn over all previously collected HIT Payments received from the Plaintiff.

**WHEREFORE,** the Plaintiff demands judgment against the Defendant; (i) directing the Defendant to immediately pay to the Plaintiff the sum of $8,891,397.32; and (ii) for such further relief as the Court may allow.

### COUNT III

*Recovery of Fraudulent Transfers under 11 U.S.C. § 548 for HIT Payments made within two years of the Petition Date*

50. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 49 of this Complaint and make the same a part hereof as if more fully set forth herein.

51. Bankruptcy Code § 548 provides that the Plaintiff may avoid transfers made within two years before the Petition Date, if the Plaintiff received less than reasonably equivalent value in exchange for such transfer or obligation and was insolvent at the time the transfer occurred or as a result of the transfer. 11 U.S.C. § 548(a)(1)(B).

52. The Plaintiff made $3,269,748.24 in HIT Payments in the two years immediately preceding the Petition Date.

53. The Plaintiff should never have been subject to an assessment or required to make HIT Payments.

54. Had the Plaintiff not been assessed the HIT Payments, the Plaintiff would have been able to fund the increased costs related to COVID-19 testing.

55. As a result of the Defendant's erroneous assessment, the Debtor became "insolvent" as that term is defined under § 101(32).

**WHEREFORE,** the Plaintiff demands a judgment against the Defendant for: (i) the amount of $3,269,748.24; and (ii) and for such other relief as the Court deems just and equitable.

### COUNT IV

*Recovery of Fraudulent Transfers under 11 U.S.C. § 544 and N.J.S.A. 25:2-25(b) and/or 27(a) for HIT Payments made within four years of the Petition Date*

56. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 55 of this Complaint and makes the same a part hereof as if more fully set forth herein.

57. The Plaintiff made the HIT Payments to the Defendant.

58. The Plaintiff received less than reasonably equivalent value for the HIT Payments.

59. The Plaintiff was insolvent on the date of the HIT Payments or became insolvent as a result of the HIT Payments.

60. The Plaintiff: (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the Plaintiff were unreasonably small in relation to the business or transaction; or (ii) intended to incur or believed or reasonably should have believed that the Plaintiff would incur, debts beyond the Plaintiff's ability to pay as they became due.

61. The HIT Payments constitute fraudulent transfers pursuant to N.J.S.A. 25:2-25(b) and/or 27(a).

62. The Plaintiff is entitled to avoid the HIT Payments pursuant to 11 U.S.C. 544 and N.J.S.A. 25:2-25(b) and/or 27(a).

63. The Plaintiff is entitled to recover the HIT Payments from the Defendant pursuant to N.J.S.A. 25:2-30(b) and 11 U.S.C. §550.

**WHEREFORE,** the Plaintiff demands a judgment against the Defendant for: (i) the amount of $6,444,534.44; and (ii) and for such other relief as the Court deems just and equitable.

## COUNT V

### *Recovery of Avoided Transfers under 11 U.S.C. § 550*

64. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 63 of this Complaint and makes the same a part hereof as if more fully set forth herein.

65. Plaintiff is entitled to avoid the HIT Payments pursuant to §§ 544 and 548 of the Bankruptcy Code (the "Avoided Transfers").

66. Under § 550 of the Bankruptcy Code, Plaintiff is entitled to recover the Avoided

11

Transfers from Defendant.

**WHEREFORE**, the Plaintiff demands a judgment against the Defendant for: (i) the amount of $6,444,534.44; and (ii) for such other relief as the Court deems just and equitable.

            **GENOVA BURNS, LLC**
*Counsel to Affiliated Physicians and Employers Master Trust d/b/a Member Health Plan NJ*

DATED: July 26, 2021            DONALD W. CLARKE