| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** <br> Caption in Compliance with D.N.J. LBR 9004-2(c) <br> **GENOVA BURNS, LLC** <br> 110 Allen Road, Ste. 304 <br> Basking Ridge, New Jersey 07920 <br> Phone: (973) 533-0777 <br> Fax: (973) 533-1112 <br> *Counsel to Affiliated Physicians and Employers Master Trust* <br> **DANIEL M. STOLZ, ESQ.** <br> **DONALD W. CLARKE, ESQ.** | |
| In Re: <br><br> **AFFILIATED PHYSICIANS AND EMPLOYERS MASTER TRUST d/b/a MEMBERS HEALTH PLAN NJ,** <br><br> Debtor. | Case No.: 21-14286(MBK) <br><br> Judge: Honorable Michael B. Kaplan <br><br> Chapter: 11 |
| **AFFILIATED PHYSICIANS AND EMPLOYERS MASTER TRUST d/b/a MEMBERS HEALTH PLAN NJ,** <br><br> Plaintiff, <br> v. <br><br> **AETNA LIFE INSURANCE COMPANY AND AFFILIATED ENTITIES,** <br><br> Defendants. | Adv. Pro. No.: 21-_____ (MBK) |

**VERIFIED ADVERSARY COMPLAINT FOR INJUNCTIVE RELIEF**

Debtor Affiliated Physicians and Employers Master Trust d/b/a Members Health Plan NJ, (hereinafter "APEMT" or the "Debtor"), by and through their counsel, Genova Burns, LLC, alleges as follows:

1. Aetna Life Insurance Company and its affiliated entities (collectively "Aetna") is an insurance company, founded in 1853 and based in Hartford, Connecticut.

2. Prior to being acquired by CVS Health Corp. ("CVS") in 2018, Aetna generated

annual sales in excess of $60 billion, and gross income of approximately $10 billion. Aetna's valuation for its sale to CVS was $69 billion. CVS is currently the fourth largest company in the United States.

3. APEMT is a Multiple Employer Welfare Arrangement ("MEWA") formed to provide affordable healthcare coverage for small-to-medium-sized businesses.

4. As of May 2019, APEMT serviced more than 3,500 employer groups that covered approximately 35,000 covered lives (employees and their dependents). An estimated 25% of the employers being serviced by APEMT – Affiliated *Physicians* and Employers Master Trust – provide health and medical care (i.e. doctor's offices, pharmacies, clinics, nursing homes, long term facilities, etc.).

5. The ongoing COVID-19 global pandemic has led directly to a strain in APEMT's financial resources. It is estimated that 95% of the COVID-19 in-patient admissions of covered employees have come from what New Jersey Law defines as "essential workers". It is estimated that, at least 80% of the covered employees of the APEMT meet the definition of "essential workers". In 2020 alone, APEMT had to cover millions of dollars in COVID-19 claim expenses, over and above the normal claim volume.

6. APEMT is dependent upon Aetna for administrating all medical claims of APEMT's covered individuals.

7. Aetna serves as the third-party administrator for APEMT, handling medical and prescription claims administration, claims processing, processing of checks and other payments, benefit plan administration, and HIPAA administration. Aetna also processes and funds medical and pharmacy claims on behalf of APEMT.

8. Aetna provides all reporting with regard to claims presented, facilitates payment of

claims, and deals with all providers and covered individuals.

9. Aetna secures and maintains pricing contracts with health care providers and passes those "provider discounts" to APEMT. In fact, APEMT's actuaries and other professionals rely on those discounts for setting rates based on estimates of projected liabilities.

10. APEMT does not have the capacity or resources to perform the services that Aetna provides on the scale at which Aetna provides them. Without Aetna's ongoing services, APEMT would not be able to receive and process claims made by its covered individuals, negotiate pricing schedules and provider discounts with health care providers, or arrange for the payment of claims made by covered individuals regardless of whether sufficient funds were available to pay all claims.

11. Although Aetna can work and has been working with APEMT within the bounds of the Master Services Agreement ("MSA") and other related agreements, all of which are valid and enforceable agreements between the parties as further described herein, recently Aetna, emboldened by its huge financial capabilities and its perceived leverage over APEMT during the ongoing COVID-19 pandemic and in this Chapter 11 Case, has attempted to exercise the discretion afforded to it by the MSA in bad faith, inconsistently with the parties' contractual expectations, and in such a way as to drive APEMT into default, giving Aetna a pretext to terminate the MSA.

12. APEMT's primary purpose in pursuing this Chapter 11 Case was to protect its employer members and their insured employees and families – an important purpose regardless of context, but even more so in light of the substantial proportion of APEMT's covered employees who are essential workers and have been putting themselves at risk during the ongoing COVID-19 pandemic.

13. By way of the within complaint, APEMT seeks to enjoin Aetna's predatory actions and threatened wrongful termination of the agreements between APEMT and Aetna.

## JURISDICTION

14. This adversary proceeding arises in Case No. 21-14286(MBK) now pending before the United States Bankruptcy Court for the District of New Jersey (the "Court").

15. The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b), 1334(b), 2201, and other applicable provisions of federal law.

16. This adversary proceeding is a core proceeding as that term is defined in 28 U.S.C. §157(b)(2)(A), (C), (E), (H), and (O).

17. Venue of this adversary proceeding in this district is proper under 28 U.S.C. §1409.

## BASIS FOR RELIEF

18. The statutory basis for the relief requested is §§ 105, 362 and 541 of the Bankruptcy Code, and Bankruptcy Rule 7001.

19. No prior adjudication of the relief requested has been made by this or any other court of competent jurisdiction.

## PARTIES AND BACKGROUND

20. On May 24, 2021, APEMT filed a voluntary petition for relief under Chapter 11, Subchapter V, of the United States Bankruptcy Code (the "Petition Date").

21. APEMT, a Debtor-in-Possession in the above bankruptcy case, is a non-profit, self-funded, Multiple Employer Welfare Arrangement ("MEWA") under the provisions of 29 U.S.C. Ch. 18 (the "Employee Retirement Income Security Act") and N.J.S.A. 17B:27C-1 *et seq.*, (the "Self-Funded Multiple Employer Welfare Arrangement Regulation Act"), and is registered with the New Jersey Department of Banking and Insurance ("NJ DOBI") annually.

4

22. In addition to registering with NJ DOBI, APEMT is also registered as a MEWA with the United States Department of Labor ("USDOL") through an annual M1 filing.

23. APEMT was approved by NJ DOBI and registered with USDOL in 2004 and began operations shortly thereafter.

24. APEMT has no direct employees, only trustees. There are currently 11 trustees for APEMT, a number of whom are physicians, and all of whom represent the sponsoring member-employers of APEMT.

25. All financial and operational aspects of APEMT are handled by Concord Management Resources ("Concord"), who has been employed in this capacity since December 1, 2017.

26. On or about July 1, 2019, APEMT entered into the MSA, attached hereto as Exhibit "A", pursuant to which Aetna agreed to provide one or more products and administrative services to APEMT and its covered individuals.

27. Pursuant to ERISA and other applicable law, Aetna is a plan fiduciary. Moreover, and pursuant to the MSA, Aetna agreed to provide certain administrative services, including acting as a fiduciary for the purpose of processing medical and pharmacy claims.

28. As set forth in a pleading filed with this Court by counsel for Aetna [see docket #37], Aetna asserts that it is not ultimately responsible for payment of APEMT's self-funded benefit obligations, and all such liability remains solely with APEMT.

29. Under the MSA, Aetna would typically: (i) first receive benefit claims, for medical care or prescriptions, submitted by health care providers on behalf of covered individuals ("Benefit Claims"); (ii) then advance funds to the health care providers for payment of approved Benefit Claims; (iii) then assess APEMT for the funds advanced to health care providers

("Funding Requests"); and (iv) lastly receive payment from an account established by APEMT for the purpose of funding such benefit obligations ("Benefit Payments").

30. In addition to the Benefit Payments, APEMT is responsible for the payment of monthly fees to Aetna for processing the benefit obligations and related services.

31. On June 10, 2021, the Court entered the *Order (I) Authorizing the Debtor to Assume the Master Services Agreement with Aetna Life Insurance Company, (II) Authorizing the Debtor to Fund Aetna's Prepetition and Postpetition Funding Requests on Account of the Self-Insured Medical and Prescription Claim Obligations Incurred Pre and Postpetition, and (III) Authorizing Entry into and Performance Under Letter Agreement Dated June 8, 2021* (the "Aetna Order").

32. Pursuant to the Aetna Order, APEMT was authorized to make $3,393,388.75 in prepetition Benefit Payments, as well as pay prepetition fees due Aetna, continue making the Benefit Payments on postpetition Funding Requests, and pay postpetition administrative fees due Aetna.

33. Furthermore, the Aetna Order authorized Aetna and the Debtor to enter into the June 8th Letter Agreement which provided *in part* for Aetna to recover the value of rebates (which the Debtor had been owed) earlier than planned, so that those rebates could be applied to future Funding Requests, in exchange for the ability of Aetna (contrary to provisions in the MSA) to poach the Debtor's most lucrative member-employer for itself.

34. The fees charged by Aetna to APEMT are sizeable. The May 2021 fee was paid prior to the Chapter 11 filing. The monthly fees for June, July and August have been paid. The fees paid to Aetna for the months during this Chapter 11 case total $1,276,747.00.

35. In addition, during this Chapter 11 case, **APEMT has delivered to Aetna in**

6

**excess of $32 million for the payment of post-petition Benefit Payments.**

## AETNA'S ATTEMPT TO ENRICH AND INSULATE ITSELF THROUGH PLAN PROVISIONS

36. Throughout this Chapter 11 case, representatives of Concord have worked cooperatively and productively with business representatives of Aetna on a daily basis.

37. The Benefit Claims processed by Aetna, and ultimately funded by APEMT through Benefit Payments, can be divided into two groups: prescription claims and medical claims.

38. To assure that no covered individual was denied essential prescriptions, APEMT has funded all prescription claims on a timely basis.

39. However, because APEMT temporarily had insufficient funds to fully reimburse Aetna for ongoing medical claims presented, Aetna had placed such claims in "pending" status (sometimes referred to as "pended" claims). This means that the claims were not rejected, but they were not processed for payment (i.e., "adjudicated") until adequate funding was available.

40. Although Aetna's decision to place medical claims in pending status meant that Aetna did not issue Funding Requests to APEMT related to those claims, it also resulted in a highly inflated and grossly inaccurate valuation of the pending claims. Specifically, Aetna refused to inform APEMT which of the claims may be duplicates submitted by health care providers multiple subsequent times as a result of not previously receiving payment. Aetna also refused to apply provider discounts to the pended claims.

41. Aetna's refusals in this regard makes it impossible for APEMT, which is in the process of assessing its member-employers for additional funding, to know whether it needs to make any changes to its capitalization projections to meet any Funding Requests that Aetna may make after adjudicating pended claims. Aetna's decision to place medical claims in "pending" status while refusing to provide information on duplicate claims or applicable provider discounts

also creates the possibility that Aetna could adjudicate all pending claims at once, then send a massive Funding Request to APEMT that would overwhelm APEMT's ability to make Benefit Payments.

42. After Aetna started pending claims, Aetna continually assured the Debtor that its "system" was unable to adjudicate batches of claims commensurate with the Debtor's ability to fund Benefit Payments, and that "once the spigot was opened it could not be closed" and the Debtor would be required to fund the entirety of adjudicated claims within 24 hours.

43. Aetna's representations were and are inconsistent with Aetna's discretion as afforded by, the MSA. Specifically, while Section 5 of the MSA provides, in relevant part, that APEMT must pay Funding Requests "within twenty-four (24) hours of such request [for reimbursement from Aetna]," the MSA affords Aetna discretion in determining when to make such Funding Requests and, indeed, whether and when to adjudicate the Benefit Claims submitted by health care providers.

44. Indeed, Section 17(B)(2) of the MSA discusses Aetna's discretion in a similar context, providing, in relevant part, that once Aetna requests reimbursement from APEMT, if APEMT fails to make such a reimbursement, "Aetna has the right to cease paying claims and suspend Services until the requested funds or [fees] have been provided."

45. That Section also provides Aetna the right to "take action to terminate the [MSA] following notice to [APEMT]" if APEMT fails to make Benefit Payments within five business days of written notice by Aetna, but further expressly provides that "[a]ny termination by Aetna pursuant to this section *must be done in good faith*." (*emphasis added*).

46. Up until August 16, 2021, there was no indication of a disruption of the relationship between APEMT and Aetna. Aetna had been aware of the goal and basic plan of the

8

Debtor since the parties had been in regular contact. In short, the Debtor would collect assessments and premiums from the members and pay the adjudicated claims.

47. As APEMT prepared to file its Plan of Reorganization ("Subchapter V Plan"), under Subchapter V of the Bankruptcy Code, APEMT circulated the Subchapter V Plan to various parties, including Aetna's bankruptcy counsel, for comment.

48. To APEMT's shock, even though the Subchapter V Plan did nothing to alter the relationship between APEMT and Aetna as reflected in the Aetna Order, APEMT received from Aetna's bankruptcy counsel the attached proposed redlined changes to the Subchapter V Plan. (See Exhibit "B" attached hereto).

49. The redline changes and additions did not merely seek correction or clarification of language in the Subchapter V Plan, but rather introduced an entire new Article 6 to the Subchapter V Plan, solely for the benefit of Aetna and to the detriment of APEMT.

50. Significantly, proposed Article 6.1.2 provides that Aetna shall no longer be deemed to be acting as a Plan fiduciary, Plan administrator or Plan sponsor under ERISA. It is APEMT's belief that this provision is contrary to applicable law.

51. The proposed Article 6 requested by Aetna provided unjustified indemnity, exculpation and releases to Aetna, who is providing no funding under the Plan. Moreover, this insistence for indemnification and exculpation was layered over a demand that APEMT not be authorized to audit Aetna's adjudication of the pended Benefit Claims (past, present, or future).

52. Proposed Article 6.7 sought to graft default and termination provisions onto the Subchapter V Plan that were outside of those set forth in the MSA or in the Aetna Order.

53. In addition to the foregoing, Aetna proposed pre-funding "batches" of Benefit Claims – an ability Aetna consistently represented they did not possess.

54. Finally, and most offensively, Aetna proposed that the Bankruptcy Estate should pay other undefined fees in unspecified amounts, as well as a "special fee" in the amount of $250,000.00.

55. Through Aetna's proposed Subchapter V Plan changes, Aetna sought to rid itself of its ERISA-related fiduciary duties, insulate itself from examination for how it adjudicates pended Benefit Claims, require APEMT's estate to cover costs that could have arisen by Aetna's actions during this case, and require APEMT to pay exorbitant and arbitrary fees.

56. In response to the proposed changes to the Subchapter V Plan requested by Aetna, counsel for APEMT responded as follows:

> "We are not going to burden the Plan process with these extraneous provisions, many of which might be deemed objectionable by the UST and DOBI in the context of a Plan. We are happy to work with you and your client on an Amendment to the Assumption Order to provide for a wind down under which we will entertain the provisions you have requested. I would think long and hard if I were Aetna about angering DOBI and DOL by seeking to terminate, which would cast thousands of insureds adrift."

57. Counsel for Aetna responded as follows:

> "If APEMT's position is that it will not seek to provide any measure of protection for Aetna in the Plan, I will pass this along to Aetna. Aetna certainly does not view these requests as "extraneous", and I don't see that these concepts can be addressed in the context of an Amended Assumption Order, so not sure I follow. We will certainly need to discuss the termination issue on our side, but to state the obvious, if APEMT's members are "cast adrift" that is no one's fault but APEMTs."

58. On August 20, 2021, the Debtor filed its Subchapter V Plan, without the requested changes from Aetna.

59. Concord continued to work with Aetna personnel on regular basis, without disruption. The Debtor heard nothing from Aetna's counsel between August 19, 2021, and

September 7, 2021.

60. With no prior warning, on September 7, 2021, at 3:39 p.m., APEMT's counsel received correspondence from Aetna's counsel annexed hereto and marked Exhibit "C" (the "September 7th Letter") claiming, erroneously, that APEMT was in default of its obligations under the MSA.

61. Contrary to the assertion in the September 7th Letter, APEMT was not in default under the MSA on September 7, 2021. Administrative fees due to Aetna under the MSA have been paid for June, July and August, totaling $1,276,747.00. All pharmacy claims have been funded on a continuing and timely basis. No other fees were due to Aetna of which APEMT was aware.

62. However, unbeknownst to APEMT, Aetna had unilaterally decided to remove the "pending" status of certain Benefit Claims, beginning to adjudicate, approve, and pay them in batches, thus creating a reimbursement obligation on behalf of APEMT but without any coordination or consultation with APEMT.

63. Not only was the clandestine nature of Aetna's new course of conduct under the MSA shocking, but it confounds the Debtor as to why Aetna would have represented that they could not adjudicate batches of claims to help ensure prompt and complete payment.

64. Now, after at first denying but then proving that limited batch processing is a possibility, Aetna is threatening to process the claims in such a manner as to ensure the Debtor cannot promptly fund them so that Aetna can move for stay relief to terminate the MSA.

65. Again, it is important to note that the $100 million of accumulated claims referenced in the September 7th Letter is intentionally misleading and inflated. That number represents the total "billed" Benefit Claims, without any of the contractual provider discounts

11

that Aetna has negotiated with health care providers and without any application of covered individuals' responsibility, such as copays, deductibles and coinsurance amounts. Under normal circumstances, APEMT would only be responsible for reimbursement of the discounted Benefit Claims after applying claim edits and covered individuals' responsibility, and APEMT relies upon the provider discounts negotiated and applied by Aetna in order to project APEMT's future liabilities.

66. APEMT has repeatedly requested that Aetna perform an analysis of the pending claims to apply the contractual provider discounts, which in many cases could be as much as 75% of the "billed claim". Aetna has refused to provide such an analysis or apply the provider discounts to the accumulated claims referenced in the September 7th Letter.

67. In addition, upon information and belief, health care providers whose Benefit Claims have been pended, and who have, therefore, not yet been paid for the medical care they provided, have resubmitted the same Benefit Claims on a monthly basis during the period in which those claims were pended, leading to an amount of duplicate Benefit Claims that is unknown but believed to be significant.

68. Despite repeated requests from APEMT and Concord for clarity regarding the applicable provider discounts and the number of duplicate claims, Aetna has unfairly refused to apply provider discounts until claims are processed for payment, and has unfairly refused to identify duplicative Benefit Claims, even though these accommodations are within Aetna's discretion under the MSA and are consistent with the parties' contractual expectations.

69. Upon information and belief, the actual amount of outstanding medical claims that APEMT will have to reimburse is in the range of $20 million to $25 million. That figure cannot be verified until Aetna provides the contractual provider discounts and eliminates duplicate

claims.

70. By letter dated September 8, 2021, a copy of which is annexed hereto and marked Exhibit "D", counsel for APEMT requested that Aetna retract the September 7th Letter and further requested that Aetna not begin funding claims until that process could be coordinated with APEMT and Concord.

71. Notwithstanding the foregoing, Concord has been notified that Aetna has unilaterally begun to process and pay certain claims. APEMT has no idea has this process is unfolding, nor which claims Aetna has chosen to pay, and Aetna is withholding that information and refusing to work constructively with APEMT.

72. Further, Aetna appears to be processing and paying Benefit Claims on a first-in-first-out basis. APEMT requested that Aetna, to the extent it is now unilaterally processing and paying Benefit Claims without further coordination or consultation with APEMT, process Benefit Claims according to the amount of the claim, beginning with the largest claims. This is within Aetna's discretion under the MSA, and would permit APEMT to utilize its statutorily-mandated stop-loss insurance coverage in order to defray the cost of some of the larger Benefit Claims.

73. However, Aetna has refused this request, claiming that it is prevented by ERISA from adjudicating claims in that manner. Upon information and belief, there is no provision of ERISA that prevents Aetna from complying with this request.

74. Upon information and belief, Aetna's unilateral decision to begin adjudicating and paying certain Benefit Claims, while refusing to provide APEMT basic information about provider discounts and duplicative claims, refusing to process claims according to the size of the claim, and otherwise refusing to coordinate and consult with APEMT regarding the payment of

Benefit Claims, was undertaken: (i) in bad faith and in retaliation for APEMT's refusal to agree to Aetna's unfair, one-sided, and coercive proposed Plan changes; and (ii) as a means to provide Aetna with a pretext for the exercise of Aetna's contractual right to terminate the MSA by forcing APEMT to make Benefit Payments in the specific way – out of several ways available to Aetna – most likely to lead to a default by APEMT.

75. APEMT, its creditors, its bankruptcy estate, its member employers, and its covered individuals, will all be irreparably harmed if Aetna is allowed to terminate the MSA and is permitted to unilaterally begin funding claims, without coordination and approval by APEMT.

76. Specifically, if Aetna is permitted to terminate the MSA, APEMT would have no access to the provider discounts negotiated by Aetna, and no way to process the millions of dollars in pending or outstanding Benefit Claims already submitted to Aetna. Health care providers would be left without payment for services, and would be required to secure payment directly from APEMT's covered individuals, who would be left to fend for themselves against providers seeking payment and without any of the previously negotiated provider discounts.

77. Even if APEMT was able to secure another entity to process pending or outstanding Benefit Claims, APEMT would have no access to important processing details such as covered individuals' previously processed deductibles or co-insurance amounts, or the claim edits or cost controls that typically stop a claim from being paid erroneously.

78. The irreparable consequences for APEMT itself include an inability to calculate the potential medical claim exposure or recover the resulting shortfall from its members.

79. The irreparable consequences for the Debtor's members will be even more dire, including being responsible for exponentially higher assessments than the Debtor has already been forced to levy.

80. The irreparable consequences for the covered members' employees will be the resulting personal responsibility to the medical providers for the services underlying the unpaid medical claims.

81. In sum, the MSA forms the foundation upon which APEMT and Aetna have built a complex and intricate health care insurance system to serve APEMT'S member employers and covered individuals. If Aetna is permitted to terminate the MSA under the circumstances described herein – i.e., as a result of exercising its discretion in bad faith and frustrating the contractual expectations of APEMT – that health care insurance system would collapse during a global pandemic, casting thousands of essential workers in New Jersey adrift.

## COUNT ONE
### Breach of the Implied Covenant of Good Faith and Fair Dealing

82. APEMT repeats and re-alleges all previous allegations as if fully set forth herein.

83. The MSA, including the Aetna Order, is a valid and enforceable contract between APEMT and Aetna, and which contains an implied covenant of good faith and fair dealing which requires Aetna to deal fairly with APEMT and to satisfy all of Aetna's obligations under the MSA and the Aetna Order in good faith.

84. APEMT has satisfactorily and in good faith performed all obligations as required by the MSA and the Aetna Order.

85. Although not expressly set forth in the MSA or the Aetna Order, Aetna previously exercised its discretion under the MSA and the Aetna Order to characterize certain Benefit Claims as "pending" and defer ultimate payment of such claims.

86. However, as of September 7, 2021, and as a result of APEMT rejection of Aetna's unfair and coercive proposed changes to APEMT's proposed Subchapter V Plan, Aetna has refused to continue pending claims, and has refused to and coordinate with APEMT regarding

15

payment and reimbursement of same.

87. Specifically, although not expressly set forth in the MSA or the Aetna Order, APEMT requested that Aetna: (i) provide information regarding provider discounts as they may be applied to any pending or outstanding Benefit Claims; (ii) provide information regarding duplicative pending or outstanding Benefit Claims; and (iii) process pending or outstanding Benefit Claims according to their size and in such a way as to permit APEMT to utilize its stop-loss insurance. Aetna had and continues to have the discretion under the MSA and Order, as well as the practical ability, to comply with each of these requests, all of which are consistent with the contractual expectations of the parties. Nevertheless, Aetna has unfairly refused each of these requests.

88. Upon information and belief, Aetna's above-described conduct and refusals of APEMT's reasonable requests constitute both: (i) Aetna's bad faith retaliation for APEMT's refusal to agree to Aetna's unfair, one-sided, and coercive proposed Plan changes; and (ii) Aetna's attempt to create a pretext for the exercise of Aetna's contractual right to terminate the MSA.

89. Aetna's above-described conduct and refusals were undertaken with the purpose of depriving APEMT of the benefits of the MSA and the Aetna Order, and threatens to irreparably damage APEMT, its member employers, and its covered individuals.

**WHEREFORE** APEMT demands:

A. Temporary and preliminary injunctions to maintain the status quo by preventing Aetna from terminating the MSA pursuant to Section 17(B)(2) of the MSA, and by ordering Aetna to continue its practice of adjudicating medical Benefit Claims while coordinating and consulting with APEMT in good faith regarding reimbursement of such claims.

B. An award of costs and fees for this action; and

C. Such other relief as this Court deems just and proper.

          **GENOVA BURNS, LLC**
          *Counsel for Affiliated Physicians Employers Master Trust*

By: _____
        DANIEL M. STOLZ

DATED: September 16, 2021

## VERIFICATION

I, LAWRENCE DOWNS, hereby certify and verify under penalty of perjury that:

1. I serve as the Chairman of the Board of Trustees for the Affiliated Physicians and Employers Master Trust.

2. I have read the factual allegations contained in the Verified Complaint and affirm such allegations are true and accurate to the best of my knowledge, information, and belief.

3. I am aware that if any of the allegations contained in the foregoing Verified Complaint are willfully false, that I am subject to punishment.

By: /s/ Lawrence Downs
    LAWRENCE DOWNS

DATED: September 16, 2021