UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1**

**MIDDLEBROOKS SHAPIRO, PC**
841 Mountain Avenue, First Floor
Springfield, New Jersey 07081
(973) 218-6877
*middlebrooks@middlebrooksshapiro.com*
Attorneys for Creditors, Nissenbaum Law Group,
LLC and Gary D. Nissenbaum, Esq.

| | |
|---|---|
| In re: | Subchapter V Chapter 11 |
| **AFFILIATED PHYSICIANS AND EMPLOYERS MASTER TRUST d/b/a MEMBER HEALTH PLAN NJ**, | Chief Judge Michael B. Kaplan |
| | Case No. 21-14286(MBK) |
| Subchapter V Chapter 11 debtor. | Hearing Date:  December 9, 2021<br>10:00 a.m. |

**CERTIFICATION OF GARY D. NISSENBAUM, ESQ. IN SUPPORT OF MOTION (A) TO CONVERT THIS MATTER TO A STANDARD CHAPTER 11 NOT GOVERNED BY SUBCHAPTER V; (B) TO FORM A CREDITORS' COMMITTEE; (C) FOR JUDICIAL DETERMINATION OF FULL AND FINAL ASSESSMENTS IN CONFORMANCE WITH N.J.S.A. 17B:27C-7; AND (D) FOR RELATED RELIEF**

**GARY D. NISSENBAUM, ESQ.**, of legal age, hereby certifies as follows:

1.      I am the Managing Member of the Nissenbaum Law Group, LLC ("Nissenbaum Law"),

a creditor in the above-referenced matter. I submit the within Certification in support of our Motion (a)

to Convert This Matter to a Standard Chapter 11 not Governed by Subchapter V; (b) to Form a

Creditors' Committee (c) For Judicial Determination of Full and Final Assessments in Conformance

With N.J.S.A. 17B:27C-7; and (d) For Related Relief (the "Motion").

**Based Upon the Court's Recent Determination That the Nissenbaum Law Group, LLC and Gary D. Nissenbaum, Esq. are Creditors in This Matter With the Right to File Proofs of Claim, All of the 2,300 Similarly Situated Employer Groups Must be Given Notice That They Are Likewise Creditors in This Matter and Have the Right to Form a Creditors' Committee to Protect Their Interests.**

2.      On November 9, 2021, this Court determined that the Nissenbaum Law Group and I are creditors of the estate. See, filed Amended Order Granting Motion for Filing of Late Proof of Claims By Nissenbaum Law Group, LLC and Gary D. Nissenbaum, Esq. and For Related Relief (Docket No. 197) *See* attached hereto as Exhibit A.

3.      The Debtor is a "Self-Funded Multiple Welfare Arrangement Regulation Act" ("MEWA") that was formed pursuant to N.J.S.A. 17B:27C-1 *et seq.* As such, and as confirmed in the Debtor's report to the Court, there are approximately 2,300 similarly situated employer health insurance groups in the Debtor's MEWA health plan; or as the Debtor put it, "approximately 2,300 member/employers and 27,000 covered individuals."[1]

4.      The reason the Nissenbaum Law Group and I are creditors, as has been determined by this Court, is the same reason all of those other 2,300 employer groups are likewise creditors. Again, we are all similarly situated.

5.      But the vast majority of them presumably do not know it. The reason is that they have been told by the Debtor in the dunning letters sent to them seeking the 7.5% assessments that they owe the Debtor money.

6.      To the lay person—and likely most attorneys who are not schooled in the nuances of Bankruptcy law—one becomes a creditor by being owed money by the Debtor, rather than the other way around. The fact that there is such a robust and viable claim against the Debtor—hence, conferring creditor status under applicable Bankruptcy law—may well elude them.

---

[1] Debtor's Quarterly Status Report at 1-2.

7.      Therefore, we are back to the same point I have been making since the beginning: there is a serious and grossly unfair violation of fundamental due process going on here. <u>There are 2,300 creditors who have been led to believe they are not creditors</u>. The presumably huge subset of them who have gone to their local attorneys for help have likely been incorrectly told that they have no standing in this Bankruptcy.

8.      That is <u>not</u> true; this Court's Order determining that the Nissenbaum Law Group and I are creditors confirms that. But it is very likely exactly what they are all erroneously concluding.

9.      We respectfully submit that a creditors' committee must be formed to counter that mistaken conclusion.

10.     Put another way, is there any legitimate reason not to direct the Subchapter V Trustee to give written notice to these 2,300 creditors that they have the right—and are in fact being invited—to appear in this Bankruptcy and participate in it? To the contrary, there is <u>every</u> reason to do so.

**There is Good Cause to Appoint a Creditors' Committee Under Subchapter V of Chapter 11 in the Instant Matter. In the Alternative, Based Upon the Court's Recent Determination That the 2,300 Employer Groups are Creditors in This Matter, this Bankruptcy Case Should No Longer Even Proceed Under Subchapter V Since the Total Sum Owed to the Creditors Exceeds the $7.5 Million Debt Limit Under the Coronavirus Aid, Relief, and Economic Security Act § 1113(a), Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020). For That Additional Reason, a Creditors' Committee Should be Formed Under the Rules <u>Relating to Standard Chapter 11 Matters.</u>**

11.     The Debtor has actively opposed the formation of a creditors' committee. Indeed, by filing this matter as an abbreviated Subchapter V Chapter 11, the Debtor obviated the initial formation of a creditor's committee—and the more robust procedures that would have thereby applied for such items as placing potential creditors on notice and giving them a voice to oppose the actions taken (and inaction) by that very Debtor.

12.     The Debtor has continued to take the position that a creditors' committee would be a waste of resources and should not even be considered.

The 'request' for this Court to *sua sponte* convert this Subchapter V Case to a standard Chapter 11 is not only procedurally improper, <u>but also inconsistent with Nissenbaum's concern over the cost of these proceedings</u>. Should this case be converted to a standard Chapter 11, a creditors' committee would likely be formed and retain counsel, accountants, etc. at huge expense to this Chapter 11 estate. In a standard Chapter 11 case, the Debtor would also be responsible to pay huge fees to the Office of the United States Trustee.[2]

13.    That is completely wrong-headed and now that the Court has issued its recent ruling, the Debtor's position is also contrary to the law of the case. Accordingly, the Debtor should no longer be allowed to stand in the way of forming a creditors' committee. There are two main reasons.

14.    First, it should be noted that Subchapter V <u>does</u> allow a creditors' committee to be formed; it just does not <u>require</u> it. The Small Business Reorganization Act of 2019 ("SBRA")[3] amended § 1102(a)(3) to provide that a committee of unsecured creditors will not be appointed in the case of a small business debtor unless the court for cause orders otherwise. Prior to the amendment, § 1102(a)(3) provided for the U.S. Trustee to appoint a committee in a small business case unless the court, for cause, ordered that a committee not be appointed."[4]

15.    If ever cause existed to form a creditors' committee, it is this situation.  Two thousand three-hundred creditors have been told they are not creditors. Our federal court system is not based upon the admitted expediency of 2,300 potential adversaries of the Debtor being kept in the dark and thereby sidelined. The fact that they have been led to believe they do not have standing in this matter because they are not creditors may make things easier for the Debtor, but that is not how the federal judicial

---

[2] Debtor's Response to Motions of Nissenbaum Law Group for Authority to File Late Claim, for Mediation and Other Relief ("**Debtor's Response**") , dated November 1, 2021 at para. 43 (emphasis added)

[3] Pub. L. No. 116-54, 133 Stat. 1079 (codified in 11 U.S.C. §§ 1181-1195 and scattered sections of 11 U.S.C. and 28 U.S.C.).

[4] A Guide to the Small Business Reorganization Act of 2019, Revised July 2021, Honrable Paul W. Bonapfel, U.S.B.J, D.D. Ga. at 75.

system works. It must be corrected.

16.    What would be the "cause" be to appoint a creditors' committee? Just one notable example would be to have a group of voices (other than my lone one which the Debtor's counsel has gone out of his way to mock[5]) to point out that the 7.5% assessment the 2,300 employer groups received from the Debtor—with the corresponding threats to sue if they did not pay up—includes an estimate of future and unapproved bankruptcy administrative costs in <u>gross</u> violation of 11 U.S.C. §§327 and 328 of the Bankruptcy Code. Such administrative assessments <u>must</u> require Court approval. *Id*. A creditors' committee would presumably object to the lack of it.

17.    Second, there is an even more pressing reason a creditors' committee must be formed: pursuant to federal law, this matter may not proceed under Subchapter V. The $7.5 million debt limit set forth in the Small Business Reorganization Act of 2019 <u>has been exceeded</u>. ("SBRA amended the § 101(51D) definition of "small business debtor," and the CARES Act temporarily increased the debt limit for a sub V debtor to $7.5 million.").[6]

18.    How do we know that the debt limit has been exceeded? Since the 2,300 employer groups have now all been determined to be creditors, the Debtor's own report indicates that the total debt when this case was filed was far <u>higher</u> than $7.5 million. "After an actuarial analysis, it was determined that the amount necessary to pay all claims and expenses would be in the range of $18 to $25 million."[7]

---

[5] Part of Debtor's counsel's six figure fee application no doubt includes his billable time to call out what he believes is my "bizarre and unfocused pleading" (Debtor's Response, p. at ¶37) and to note his assessment that I apparently suffer from an undiagnosed hyperactivity disorder. "We are frankly perplexed by the hyperactivity of Nissenbaum Law Group in this Chapter 11 case." (Debtors' Quarterly Report at 5). A shining example of billable time well spent in service of the estate's interests.

[6] A Guide to the Small Business Reorganization Act of 2019, Revised July 2021, Honrable Paul W. Bonapfel, U.S.B.J, D.D. Ga. at 17.

[7] Debtor's Subchapter V Status Report at 3.

19.   Moreover, even the Debtor admits that it has only collected approximately $12 million of the total sum of between $18 to $25 million.[8]

20.   The point is that not only do the Subchapter V provisions of the Bankruptcy Code allow the court to appoint a creditors' committee for cause; the Subchapter V provisions do not even apply in the first place, and therefore, a creditors' committee should be appointed as a matter of course.

**The Subchapter V Trustee or the Office of the United States Trustee Should be Directed to Inform all Approximately 2,300 of the Debtor MEWA's Employer Groups of Their Status as Creditors and Invite Them to Participate in a Creditors' Committee.**

21.   The United States Trustee or the Subchapter V trustee should be tasked with informing all 2,300 of the Debtor MEWA's employer groups of their status as creditors and their right to participate in a creditors' committee. There is no other party-in-interest in a position to do so, and after all, this is the very function of the United States Trustee and/or a Chapter 11 Trustee in a standard Chapter 11 proceeding.

22.   As stated above, the Debtor has a vested interest in having no creditors' committee in this matter and has actively opposed it. Therefore, tasking the Debtor with this would be akin to asking the fox to guard the chicken coop. Not a good idea.

23.   I cannot do it because I lack the resources in both time and budget to handle such an undertaking. It is simply beyond the reasonable allocation of my eight (8) attorney law firm's administrative capabilities.

24.   The State of New Jersey cannot do it because of a reason that is highly troubling (and will be discussed at length below).

25.   The Office of the United States Trustee and the Subchapter V trustee are the only parties that do not have a vested interest in undermining the formation of a creditors' committee and at the same

---

[8] Debtor's Motion to Quash Subpoena for Rule 2004 Examination, dated October 29, 2021 at para. 10.

time have the resources to take something like this on.

26.    I should also respectfully add that to avoid confusion and second-guessing, the Office of the United States Trustee and/or the Subchapter V trustee should be directed to include in the notice the following basic information at a minimum:

   a.  the citation of this matter and the digital link to access the record on PACER;

   b.  the fact that the Employer Group receiving the notice has been determined to be a creditor of the estate and why;

   c.  the fact that serious questions have been raised pursuant to 11 U.S.C. §§327 and 328 of the Bankruptcy Code about the right that the Debtor MEWA had to demand the 7.5% assessment in the first place;

   d.  the actual dollar amount of the fee applications that each professional in this matter has submitted and the fact that there is no creditors' committee to object to them;

   e.  the fact that these fee applications are administrative claims that will be putatively collectible against the employer groups and their participating employees both before and after the Bankruptcy matter is concluded;

   f.  the fact that although the 7.5% assessment might (or might not) have been affordable to any particular employer group, it is likely not the last assessment. In fact, there is presumably no upper limit as to how much higher the MEWA's shortfall may go. As referenced above, the Debtor's last report to the Court stated that "[a]fter an actuarial analysis, it was determined that the amount necessary to pay all claims and expenses would be in the range of $18 to $25 million." But with these added administrative expenses, including the enormous fee applications for all the professionals in this

matter, it could go <u>much</u> higher.[9]

g.  the fact that each employee in the healthcare group and the employer healthcare groups themselves are jointly liable for many millions of dollars in a proportion set forth under a complex and obscure formula contained in the New Jersey statutes. That means the potential for significant <u>personal</u> liability.

27.     As I have stated in my previous certifications, the Debtor has caused this complete mess through an abuse of the Bankruptcy system that is hiding in plain sight. It is a public matter as to which the public is being shut out. No one is telling the people affected that they have the legal right to have a voice since they are creditors, and the case itself is proceeding as a Subchapter V without the jurisdiction to do so. This cannot go on.

28.     There is one more thing that I must stress, as it is absolutely essential to understanding the incredibly high stakes here. As I have stated previously, this is different than the typical scenario of administrative costs being solely a drain on a potential payout to creditors under a plan of reorganization; tens of thousands of innocent people may well foot the bill as <u>statutory</u> indemnitors under N.J.S.A. 17B:27C-1 et seq.

29.     That is because once the plan of reorganization is confirmed, these same 2,300 employer groups (and possibly their participating employees) will be targets for indemnification of both (a) the remaining Bankruptcy administrative costs and (b) the shortfall in the MEWA payments to the healthcare and pharmaceutical entities that provided services and items for patient care.

30.     But of course, by then, the Debtor will have bolted from the scene, and thousands of innocents will be left holding the bag. Why not hear from them now, rather than later when it will be too late? Isn't that the fair thing to do?

---

[9] Notably, I have set forth a potential solution to this problem in a later section of this certification.

**Another Reason to Appoint a Creditors' Committee is That the State of New Jersey Department of Banking has Been Divested of its Ability to Regulate the Debtor in Service of the Public Interest.**

31.    I have attached hereto as <u>Exhibit B</u> a letter, which has been redacted to protect the privacy of the addressee. It is from the NJ Department of Banking and Insurance ("**DOBI**") and is <u>very</u> troubling. It provides yet another reason that a creditors' committee is so vital to protect the public interest in this matter: DOBI is no longer in a position to fulfill its very important statutory role of enforcing the laws and regulations of the State of New Jersey as they apply to the Debtor MEWA.

32.    The person submitting the questions to DOBI is a representative of one or more of the 2,300 employer groups. This person has posed to DOBI the question of how the 7.5% assessment was calculated. More specifically, as the question was summarized by DOBI, "you contended that the explanation provided by [the Debtor MEWA] of how each member's assessment was calculated does not conform with N.J.S.A. 17B:27C-7. Specifically, you argued that the assessment should only be for the prior fiscal year (the 12 months in 2020) rather than a period exceeding a year. You also had an issue with why the reserves need to be replenished at all if the MEWA is bankrupt and a stop loss policy is paying claims."[10]

33.    In response to these <u>very</u> legitimate questions, the DOBI representative replied that "[the Debtor MEWA] is also seeking to liquidate, separate from the regulatory process, through bankruptcy proceedings filed pursuant to Chapter 11 of the Bankruptcy Code. This filing was made without advance notice to the State in May 2021. As such, [the Debtor MEWA's] decision to file for Chapter 11 bankruptcy instead of following the state regulatory process necessitates that the court must decide if the

---

[10] *See*, <u>Exhibit B</u>, correspondence dated November 21, 2021 from the New Jersey Division of Banking and Insurance.

assessment conforms with N.J.S.A. 17B:27C-7."[11]

34.     That is <u>really</u> chilling. Has the Debtor asked the Bankruptcy Court to determine whether or not the 7.5% assessment conforms with N.J.S.A. 17B:27C-7? Has there been a painstaking review of the statutory formula under that statute to determine if that 7.5% was assessed correctly? Of course not.

35.     And what about future assessments? Essentially, the MEWA is now operating <u>beyond</u> regulatory enforcement.

36.     This is analogous to a surgical group filing a Chapter 11 and thereafter taking the position that any surgeries would no longer be governed by the New Jersey Board of Medical Examiners and corresponding state agencies and divisions respecting such items as the legal and regulatory requirements for how anesthesia is administered; how instruments are sterilized; and how surgical deaths are reported. It is analogous to a law firm filing a Chapter 11 and thereafter, taking the position that the New Jersey Supreme Court's version of the Rules of Professional Conduct no longer apply to its ongoing representation of clients, since the State Court's regulatory authority over the lawyers has been supplanted by the Bankruptcy Court's jurisdiction. And in both examples, the public would not have been told that there were rogue doctors and lawyers practicing without sufficient regulatory or ethical oversight.

37.     One might argue that the Bankruptcy Court itself could theoretically serve as a substitute regulatory body to ensure that the instant dissolution is carried out in a manner that comports with the New Jersey statutes and regulations and fully takes into account the legitimate interests of the employer groups and their covered employees.

38.     But is that <u>actually</u> happening? Moreover, is it even an appropriate role to foist on the Bankruptcy Court? And if the Court is going to serve as the regulatory body over the MEWA to ensure

---

[11] *See, Id.*

that the State of New Jersey's statutory and legal requirements for dissolution are followed, where is the order memorializing it? And by the same token, exactly which New Jersey laws and regulations are to be enforced and which ones are to be ignored? Is anyone minding the store?

39.     The very fact that these questions are not even being raised is a compelling reason that a creditors' committee is needed. (Perhaps it is also why the Debtor is so adamant that one should not be formed.)

**There Should be a Judicial Determination of a Full and Final Appropriate Assessment In Conformance With N.J.S.A. 17B:27C-7, with a Corresponding Bar to Further Efforts by Any Person or Entity From Seeking Additional Sums From the Employer Groups and the Employee Insureds.**

40.     Given all of this, what is the end game? In other words, if what is set forth above are the reasons this matter needs to be ratcheted up so that it complies with the law and basic principles of due process and the right to be heard, is there also a way to ratchet it down to obtain a full and final resolution of the matter and reach a conclusion of it?

41.     Ironically, by divesting DOBI of its authority to apply the statutory mandate of how members of a MEWA should be assessed in a dissolution, and likewise nullifying the voices of 2,300 creditors who have been left out, the Debtor has disconnected the brakes on this runaway train to nowhere. But there is a clear way of reinstalling those brakes, of resolving this entire Bankruptcy matter that should be acceptable to all. The answer is actually set forth in the wording of N.J.S.A. 17B:27C-7.

42.     Section (a) of that statute states, "[t]he liability of each member for the obligations of the self-funded multiple employer welfare arrangement shall be individual, several and proportionate, but not joint, except as provided in this section." This is followed by a complex formula set forth in subsections (b) and (c) of how that calculation is made.

43.     But the important item for purposes of fully and fairly resolving this Bankruptcy matter is located in subsection (d). It contemplates that a court can set a <u>full and final</u> assessment ("**Final**

**Assessment**").  under a formula that factors in current and future costs and allocates them among the employer groups on a pro rata basis.

> In the event of a rehabilitation, liquidation, conservation or dissolution of a self-funded multiple employer welfare arrangement, <u>the court, pursuant to section 11 of this act,  may assess the members in the amounts needed to pay all incurred but unpaid claims and all projected claims, together with the costs and expenses of collecting the assessments, a reasonable loading factor for uncollected assessments and the costs and expenses of the rehabilitation, liquidation, conservation or dissolution.</u> (Emphasis added)

44.     In other words, the statute itself contemplates a full and final number that the employer groups can rely upon as <u>all they will be asked to pay</u>.

45.     That is the key to everything: one Final Assessment; no blank checks stretching into oblivion. It is the solution.

46.     This Final Assessment could presumably have a fudge factor (in the words of the statute, "a reasonable loading factor."[12]) for the potential that collections might not proceed as well as anticipated (and presumably a refund if ultimately, some or all of the fudge factor were not needed).

47.     I should add that in furtherance of this statutory solution to this matter as a whole, the Bankruptcy Court likewise obviously has the power to approve a plan of liquidation that would contain an absolute bar to any other person or entity—whether or not a party-in-interest in the instant Bankruptcy matter—from seeking additional payments from not only the Debtor MEWA, but also from the approximately 2,300 employer groups and the 27,000 employee insureds. Again, that would be an essential part of any resolution: no loose ends.

---

[12] *Id*. at subsection (d)

48.    To reach this goal, we respectfully request that this Court convene a Judicial Mediation to oversee the resolution of this matter under a (hopefully) consensual plan of liquidation that would have the following goal, in accord with the statute:

a.    Obtain a consensual, clear and straightforward mathematical interpretation of the MEWA statute's joint liability provision of N.J.S.A. 17B:27C-7, such that each of the approximately 2,300  healthcare groups will have a precise calculation of their *pro rata* share of potential liability.

b.    So long as the employer group remits that amount, there will be no assessment against the group's corresponding individual employee insureds.

c.    This Final Assessment would contain a reasonable loading factor under N.J.S.A. 17B:27C-7 in case the assumptions in the formula were too optimistic.

d.    The portion of the Final Assessment representing the reasonable loading factor would be held in escrow, to be utilized only with the prior approval of the Court. If some or all of the reasonable loading factor were ultimately not utilized, it would be refunded on the same *pro rata* basis.

e.    This flat, one-time assessment would afford a <u>complete</u> bar from any efforts by any person or entity to collect more from the employer groups or the employee insureds. This bar would apply not only to the Debtor but also any other person or entity, such as for example and without limitation, the healthcare providers, directors and officers and/or fiduciary liability or other possibly subrogated insurance carriers and any governmental instrumentality.

f.    To the extent that a party-in-interest fails to pay the flat fee, the Debtor could pursue them on an ongoing basis as the statute contemplates, but not in excess of the aggregate

*pro rata* amount they ultimately will owe, as set forth in N.J.S.A. 17B:27C-7.

g.  There would be a cap on administrative costs from legal fees, accounting fees, collection efforts, the trustee fees and so forth. The court would set forth an express set of guidelines as to the cost/benefit analysis that would need to be demonstrated for the professional in question to be deemed to have reasonably incurred the fees pursuant to 11 U.S.C. § 328. This would have an important salutary effect in that it would force all the professionals to include that express cost/benefit analysis in their fee applications.

**Conclusion**

49.    The import of the instant motion is that the debtor is arguably taking this case off the rails, but there is still a way back. The key point is to find a full and fair resolution that comports with the prevailing legal and regulatory guidelines and is fair to everyone.

50.    I respectfully request that the Court order the approach we have outlined above be implemented in the best interests of all parties-in-interest, and likewise those who should have that designation but currently do not.

I certify that the foregoing statements made by me are true. I am aware that if any of the statements contained herein are willfully false, I am subject to punishment.

_____
Gary D. Nissenbaum, Esq.

Dated:

14

# Exhibit

## "A"

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1**
**MIDDLEBROOKS SHAPIRO, PC**
841 Mountain Avenue, First Floor
Springfield, New Jersey 07081
(973) 218-6877
*middlebrooks@middlebrooksshapiro.com*
Attorneys for Creditors, Nissenbaum Law Group,
LLC and Gary D. Nissenbaum, Esq.

In re:

**AFFILIATED PHYSICIANS AND
EMPLOYERS MASTER TRUST d/b/a
MEMBER HEALTH PLAN NJ,**

Subchapter V Chapter 11 debtor.

Subchapter V Chapter 11

Chief Judge Michael B. Kaplan

Case No. 21-14286(MBK)

Hearing Date: ~~October 28, 2021~~ November 8,
10:00 a.m.

**AMENDED**

**ORDER GRANTING MOTION FOR FILING OF LATE PROOF OF CLAIMS;
~~FOR TEMPORARY ALLOWANCE OF CLAIMS FOR VOTING PURPOSES
PURSUANT TO FED. R. BANKR. P. 3018~~ BY NISSENBAUM LAW GROUP, LLC
AND GARY D. NISSENBAUM, ESQ. AND FOR RELATED RELIEF**

The relief set forth on the following pages, numbered two (2) through three (3) is hereby
**ORDERED**.

MICHAEL B. KAPLAN
USBJ

11/9/21

In Re: Affiliated Physicians and Employers Master Trust d/b/a Member Health Plan NJ
Case No. 21-14286(MBK)
Caption:  Order Granting Motion for Filing of Late Proof of Claims;
 For Temporary Allowance of Claims for Voting Purposes
 Pursuant to Fed. R. Bankr. P. 3018  by Nissenbaum Law Group, LLC
 and Gary D. Nissenbaum, Esq. and For Related Relief
Page: 2

Upon the Motion (the "Motion") of Nissenbaum Law Group, LLC and Gary D.

Nissenbaum, Esq. ("Nissenbaum"), pursuant to 11 U.S.C. §§ 101(5) and 342(a) and Fed. R. Bankr.

P. 2002(a)(1) and 3018(a) for an Order granting Nissenbaum's Motion to Allow the Filing of Late

Proofs of Claim and for Temporary Allowance of Claims for Voting Purposes; and the Court

having considered the pleadings filed in opposition (if any); and the Court having conducted a

hearing on October 28, 2021; and the Court having further considered the arguments of counsel

(if any); and it appearing that the relief requested is appropriate; and that adequate notice of the

Motion has been given and that no further notice is necessary; and after due deliberation and good

and sufficient cause appearing therefor, it is hereby

**ORDERED that:**

(1)      The Motion shall be and is hereby granted *in part. (MBK)*

(2)      Nissenbaum Law Group, LLC and Gary D. Nissenbaum, Esq. shall be and are

hereby allowed to file Proofs of Claim out of time.

(3)  *The Motion Seeking*  The claim of the Nissenbaum Law Group, LLC and Gary D. Nissenbaum, Esq. ~~shall~~ *to be*

~~be and are hereby~~ temporarily allowed solely for voting purposes only pursuant to Fed. R. Bankr.

P. 3018, *is denied without prejudice and may be renewed by correspondence to the court. (MBK)*

(4)      This Court shall retain jurisdiction with respect to all matters arising from or related

to the implementation of this Order.

In Re: Affiliated Physicians and Employers Master Trust d/b/a Member Health Plan NJ
Case No. 21-14286(MBK)
Caption: Order Granting Motion for Filing of Late Proof of Claims;
  For Temporary Allowance of Claims for Voting Purposes
  Pursuant to Fed. R. Bankr. P. 3018  by Nissenbaum Law Group, LLC
  and Gary D. Nissenbaum, Esq. and For Related Relief
Page: 3


      (5)     Movants shall serve a copy of this Order on the United States Trustee, the Debtor

and the Subchapter V trustee within seven (7) days of entry.

# Exhibit

## "B"

# State of New Jersey
## DEPARTMENT OF BANKING AND INSURANCE
PO BOX 325
TRENTON, NJ 08625-0325

TEL (609) 292-7272

**PHIL MURPHY**
*Governor*

**SHEILA OLIVER**
*Lt. Governor*

**MARLENE CARIDE**
*Commissioner*

November 12, 2021



Re: THE AFFILIATED PHYSICIANS AND EMPLOYERS MASTER TRUST

Tracking ID: ███████

Dear ███████:

Affiliated Physicians and Employers Master Trust and Members Health Plan New Jersey (APEMT/MHPNJ) is a self-funded Multiple Employer Welfare Arrangement (MEWA). Per federal and state law, self-funded MEWAs are not insurance companies, and therefore, are not subject to the same laws and regulations as insurance companies. Additionally, given that APEMT/MHPNJ is self-funded, the protections that are afforded to consumers or employers in a fully insured plan do not apply. Specifically, APEMT/MHPNJ does not participate in any of the guarantee funds created by New Jersey law that pay the claims of insolvent insurance companies. APEMT/MHPNJ and the member's broker should have disclosed the above facts to its members at the time they signed up with APEMT/MHPNJ. The application that all employers are required to sign when joining a MEWA, such as APEMT/MHPNJ, must contain a notice explaining that the guaranty funds will not pay their claims or protect their assets if the MEWA becomes insolvent or is unable to make payments as promised. The application and the plan must also contain a statement notifying members that the plan is fully assessable and that members shall be required to contribute the funds necessary to meet any unfilled obligations of the MEWA.

In your email to the New Jersey Department of Banking and Insurance, you contended that the explanation provided by APEMT/MHPNJ of how each member's assessment was calculated does not conform with N.J.S.A. 17B:27C-7. Specifically, you argued that the assessment should only be for the prior fiscal year (the 12 months in 2020) rather than a period exceeding a year. You also had an issue with why the reserves need to be replenished at all if the MEWA is bankrupt and a stop loss policy is paying claims.

Due to its noncompliance with New Jersey law and regulations, APEMT/MHPNJ is no longer registered to operate as of June 2021. APEMT/MHPNJ has acknowledged its inability to comply with New Jersey's

---

*Visit us on the Web at dobi.nj.gov*
*New Jersey is an Equal Opportunity Employer • Printed on Recycled Paper and Recyclable*

solvency requirements and agreed to dissolve.  APEMT/MHPNJ is also seeking to liquidate, separate from the regulatory process, through bankruptcy proceedings filed pursuant to Chapter 11 of the Bankruptcy Code. This filing was made without advance notice to the State in May 2021.

As such, APEMT/MHPNJ's decision to file for Chapter 11 bankruptcy instead of following the state regulatory process necessitates that the court must decide if the assessment conforms with N.J.S.A. 17B:27C-7. Thank you for contacting us.

Sincerely,

Erik McDermott
Investigator
Phone: (609) 940-7519
Fax: (609) 777-0508
erik.mcdermott@dobi.nj.gov