<table>
<tr><td>

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-2(c)

**GENOVA BURNS LLC**
110 Allen Road, Suite 304
Basking Ridge, NJ  07920
Phone: (973) 467-2700
Fax: (973) 467-8126
*Counsel to Affiliated Physicians and Employers*
*Master Trust d/b/a Member Health Plan NJ*
**DANIEL M. STOLZ, ESQ.**
**DONALD W. CLARKE, ESQ.**

In Re:

**AFFILIATED PHYSICIANS AND**
**EMPLOYERS MASTER TRUST d/b/a**
**MEMBER HEALTH PLAN NJ**

Debtor.

</td><td>

Chapter 11

Hon. Michael B. Kaplan

Case No.: 21-14286-MBK

</td></tr>
</table>

## SECOND AMENDED
## SMALL BUSINESS DEBTOR'S PLAN OF ORDERLY LIQUIDATION

~~This~~This Second Amended Small Business Debtor's Plan of Orderly Liquidation (the "Plan") is presented to you to inform you of the proposed Plan for liquidating the assets of Affiliated Physicians and Employers Master Trust d/b/a Member Health Plan NJ, the debtor and debtor-in-possession (the "Debtor" or "APEMT"), and to seek your vote to accept the Plan.

You are encouraged to carefully review the full text of this document, including all exhibits and attachments, before deciding how to vote on the Plan.  To assist you in your review, please note that a list of definitions and a section of frequently asked questions appear at the end of this document.

**IN ADDITION TO CASTING YOUR VOTE TO ACCEPT OR REJECT THE PLAN, YOU MAY OBJECT TO CONFIRMATION OF THE PLAN.  IF YOU WISH TO OBJECT TO CONFIRMATION OF THE PLAN, YOU MUST DO SO BY JANUARY 6, 2022.**

**A HEARING ON THE CONFIRMATION OF THE PLAN IS SCHEDULED FOR JANUARY 13, 2022, AT 10:00 A.M. IN COURTROOM No. 8, AT THE UNITED STATES BANKRUPTCY COURT, FOR THE DISTRICT OF NEW JERSEY, CLARKSON S. FISHER U.S. COURTHOUSE, 402 EAST STATE STREET, TRENTON, NEW JERSEY 08608.**

**YOUR RIGHTS MAY BE AFFECTED BY THIS PLAN. YOU SHOULD
CONSIDER DISCUSSING THIS DOCUMENT WITH AN ATTORNEY.**

**GENOVA BURNS, LLC**
*Counsel to Affiliated Physicians and Employers Master
Trust d/b/a Member Health Plan NJ*

Dated:  ~~August 20~~December 9, 2021

_____

**DONALD W. CLARKE**
110 Allen Road, Suite 304
Basking Ridge, NJ  07920
Phone: (973) 467-2700
Fax: (973) 467-8126

## TABLE OF CONTENTS

Summary of the Plan and Distribution to Creditors ................................................. 67

**ARTICLE I** - History of the Business Operations of the Debtor ................................ 78

    1.1    Nature of the Debtor's Business ......................................................... 78

    1.2    History of Business Operations of the Debtor ................................. 78

    1.3    Filing of the Debtor's Chapter 11 Case ........................................... 89

    1.4    Legal Structure and Ownership ........................................................ 89

    1.5    Debtor's Assets ................................................................................ 89

    1.6    Debtor's Liabilities ......................................................................... 910

    1.7    Current and Historical Financial Conditions ............................... 1011

    1.8    Events Leading to the Filing of the Bankruptcy Case ................ 1011

    1.9    Significant Events During the Bankruptcy Case ......................... 1314

    1.10   Projected Recovery of Avoidable Transfers ............................... 1416

    1.11   Collection of Assessment from Members ..................................... 16

**ARTICLE 2** - The Plan ................................................................................... 1416

    2.1    Unclassified Claims ..................................................................... 1516

         A.   Administrative Expenses ......................................................... 1517

         B.   Priority Tax Claims ................................................................ 1820

    2.2    Classes of Claims and Equity Interests ...................................... 1921

         A.   Classes of Secured Claims ..................................................... 1921

         B.   Classes of Priority Unsecured Claims ................................... 1922

         C.   Classes of General Unsecured Claims ................................... 2022

         D.   Classes of Equity Interest Holders ........................................ 2122

    2.3    Estimated Number and Amount of Claims Objections ............... 2123

    2.4    Treatment of Executory Contracts and Unexpired Leases ......... 2223

    2.5    Means for Implementation of the Plan ........................................ 2224

    2.6    Payments ...................................................................................... 2324

    2.7    Post-Confirmation Management ................................................. 2325

    2.8    Tax Consequences of the Plan .................................................... 2325

    2.9    Projections in Support of Debtor's Ability to Make Payments
         Under the Proposed Plan .............................................................. 2325

**ARTICLE 3** - Feasibility of Plan ................................................................... 2325

3.1    Ability to Initially Fund Plan ............................................................ 2325

3.2    Ability to Make Future Plan Payments and Operation Without
Further Reorganization ................................................................... 2425

**ARTICLE 4** - Liquidation Analysis .......................................................... 2425

**ARTICLE 5** - No Discharge of Debtor ...................................................... 2426

5.1    No Discharge ................................................................................... 2426

**ARTICLE 6** - Treatment of Pended Medical Claims .................................... 26

6.1    Processing of Medical Claims ........................................................ 26

6.2    Rebates .......................................................................................... 27

6.3    Aetna Fees ..................................................................................... 27

6.4    Exculpation .................................................................................... 28

6.5    Events of Default and Termination ................................................. 28

**ARTICLE 7** - Subchapter V Trustee ......................................................... 29

7.1    Subchapter V Trustee Investigation and Uncovered Insider or
Professional Liability Claims .......................................................... 29

**ARTICLE 8** - General Provisions .......................................................... 2430

68.1    TideTitle to Assets ........................................................................ 2430

68.2    Binding Effect ............................................................................... 2530

68.3    Severability ................................................................................... 2530

68.4    Retention of Jurisdiction toby the Bankruptcy Court .................... 2530

68.5    Captions ........................................................................................ 2531

68.6    Modification of Plan ...................................................................... 2531

68.7    Final Decree .................................................................................. 2631

**ARTICLE 79** - Attachments ................................................................... 2631

**ARTICLE 810** - Frequently Asked Questions ......................................... 2732

**ARTICLE 911** - Definitions .................................................................... 2934

911.1    ........................................................................Rules of Construction
2934

911.2 Administrative Claimant ............................................................... 2934

911.3 Administrative Convenience Class ............................................... 2934

911.4 Administrative Expense ................................................................ 2934

911.5 Administrative Tax Claim ............................................................. 2934

911.6 Aetna Parties ................................................................................. 34

11.7    Allowed Claim ............................................................................... 2934

9.711.8 ...................................................................... Allowed Priority Tax Claim 2934

11.9-8 ................................................................................. Allowed Secured Claim 2934

9.911.10 ............................................................................ Allowed Unsecured Claim 2935

9.10 11.11 ................................................................................ Applicable Orders 35

11.12 Bankruptcy Code or Codes .......................................................................3035

9.11.13 ...............................................................................................................................

Bankruptcy Court ...............................................................................................3035

9.1211.14 ...........................................................................................................................

Bankruptcy Rules ..............................................................................................3035

9.1311.15 ...........................................................................................................................

Batch 35

11.16 Cash ...........................................................................................................3035

9.1411.17 ...........................................................................................................................

Chapter 11 Case ................................................................................................3035

9.1511.18 ...........................................................................................................................

Claim 3035

9.1611.19 ...........................................................................................................................

Class 3035

9.1711.20 ...........................................................................................................................

Confirmation ......................................................................................................3035

9.1811.21 ...........................................................................................................................

Confirmation Date .............................................................................................3036

9.1911.22 ...........................................................................................................................

Confirmation Hearing .......................................................................................3036

9.2011.23 ...........................................................................................................................

Confirmation Order ...........................................................................................3036

9.21 11.24 ...........................................................................................................................

Covered Lives .............................................................................................................36

11.25 Creditor ....................................................................................................3035

9.2211.26 ...........................................................................................................................

Debtor and Debtor-in-Possession .......................................................................3036

~~9.23~~ 11.27 ...................................................................................

Debtor's Instructions .................................................................. 36

11.28  Disputed Claim...................................................................~~31~~36

~~9.24~~11.29 ..................................................................................

Distributions ............................................................................~~31~~36

~~9.25~~11.30 ..................................................................................

Effective Date ...........................................................................~~31~~36

~~9.26~~11.31 ..................................................................................

Equity or Equity Interest Holder..................................................~~31~~36

~~9.27~~11.32 ..................................................................................

Executory Contracts...................................................................~~31~~36

~~9.28~~11.33 ..................................................................................

Final Order ...............................................................................~~31~~36

~~9.29~~11.34 ..................................................................................

IRC  ~~31~~37

~~9.30~~ 11.35 ...................................................................................

Medical Claims ..........................................................................37

11.36  Member ...........................................................................37

11.37  Outside Date .....................................................................37

11.38  Petition Date......................................................................~~31~~37

~~9.31~~11.39 ..................................................................................

Plan  ~~31~~37

~~9.32~~ 11.40 ...................................................................................

Pharmacy Claim.........................................................................37

11.41  Prefund Amount .................................................................37

11.42  Priority Tax Claim..............................................................~~32~~37

~~9.33~~ 11.43 ...................................................................................

Runoff Fee ................................................................................37

11.44  Schedules ........................................................................~~32~~37

~~9.34~~11.45 ..................................................................................

Secured Creditor ........................................................................~~32~~37

~~9.35~~11.46 ..................................................................................

Service Fee ...............................................................................37

11.47  Special Fee .......................................................................37

11.48  Trustee..................................................................................................3237

9.3611.49 ...................................................................................................

Unsecured Creditor..................................................................................3238

## SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS

On June 24, 2021, the New Jersey Department of Banking & Insurance denied the Debtor's annual registration for 2020 and 2021 and instructed the Debtor to take the necessary steps to wind down.  As a result, APEMT submitted to NJ DOBI a wind down plan (the "Wind Down") on or about July 9, 2021.  See Wind Down, current clean draft with redline, attached as **Exhibit "A."** The Debtor's plan of orderly liquidation (the "Plan") details the bankruptcy framework within which the Debtor will carry out the Wind Down.

The Wind Down provides for the termination of all coverage no later than December 31, 2021 (the "Coverage End Date"). The Wind Down and the Plan will be funded by enrolled member health care fees, as well as assessments of current and former members enrolled any time after January 1, 2020.

Pursuant to N.J.S.A. 17B:27C-7 (d), member assessments shall cover all incurred but unpaid medical claims and all projected medical claims, together with the costs and expenses of collecting the assessments, a reasonable loading factor for uncollected assessments and the costs and expenses of the Wind Down and Plan.  As such, upon receipt of the respective health care fees and assessments, the Debtor anticipates that all creditors and claims will be paid in full.

# ARTICLE 1
## HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR

### 1.1.    Nature of the Debtor's Business.

The Debtor is a self-funded multiple employer welfare arrangement ("MEWA") under the provisions of 29 U.S.C. Ch. 18 (the "Employee Retirement Income Security Act" or "ERISA") and N.J.S.A. 17B:27C-1, et seq. (the "Self-Funded Multiple Employer Welfare Arrangement Regulation Act") and is registered with the New Jersey Department of Banking and Insurance ("NJ DOBI") annually.  The Debtor is also registered as a MEWA with the United States Department of Labor ("US DOL"), through an annual M1 filing. A MEWA is a trust funded by participating employers (the "Members") to pay medical claim coverage (including medical, dental, and prescription benefits) for the Member's employees and dependents (the "Covered Lives").

### 1.2.    History of Business Operations of the Debtor

The Debtor's registration was approved in 2004 and it began operations shortly thereafter. As of May 2019, the Debtor serviced more than 3,500 Members with approximately 35,800 Covered Lives.  The Members were made up of an estimated 25% of healthcare businesses (i.e. doctor's offices, pharmacies, clinics, nursing homes, long term care facilities, etc.). It was estimated that at least 80% of the Covered Lives met the definition of whom New Jersey law deemed "essential workers." As of the Petition Date (as defined below), the Debtor had approximately 26,734 Covered Lives, 25% of which were employed by healthcare providers.

All financial and operational issues of the Debtor are handled by Concord Management Resources ("Concord") who has been employed in this capacity since December 1, 2017.  Prior to that date, QualCare, Inc., a Cigna Company, handled the financial and operational aspects of the Debtor.  The same staff that was handling the affairs of the Debtor at QualCare, are currently handling the affairs of the Debtor at Concord.

Aetna Life Insurance Company ("Aetna") serves as the third-party administrator for the Debtor, handling medical and prescription claims administration, claims processing, processing of checks and other payments, benefit plan administration, and HIPAA administration. Aetna processes and funds the medical and pharmacy claims on behalf of the Debtor, and the Debtor is obligated to promptly reimburse Aetna for such funding. The Debtor receives funding requests from Aetna daily.

The full Board of Trustees meets on a quarterly basis, or more frequently as needed. The Board of Trustees created an executive and finance committee (the "E&F Committee"), which is involved in all health plan decisions.  The E&F Committee is responsible for making sure all duties and responsibilities that are required to be performed by the Debtor are performed by persons or entities possessing the appropriate expertise and competencies for their respective duty.  Prior to the Petition Date, the E&F Committee met on a monthly basis, but often much more frequently.

The Debtor also utilizes the services of Windsor Strategy Partners ("Windsor") as actuaries. Windsor works with the Debtor on setting rates (based on estimates of projected liabilities) and NJ DOBI rate filings, monthly analysis for financial reporting, annual reserve opinions and certifications, and audit support for the external auditors.

### 1.3    Filing of the Debtor's Chapter 11 Case.

On May 24, 2021, the Debtor filed a voluntary chapter 11 petition (the "Petition Date") for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). The Chapter 11 case (the "Case") is pending in the Bankruptcy Court in Trenton, New Jersey.

### 1.4.    Legal Structure and Ownership.

The Debtor is a self-funded MEWA under the provisions of ERISA and the Self-Funded Multiple Employer Welfare Arrangement Regulation Act, and is registered with NJ DOBI and US DOL. The Debtor has no owners, or direct employees, only trustees (the "Trustees"). As of the Petition Date, there were eleven (11) Trustees for the Debtor (the "Board of Trustees"). The respective Trustees represent sponsoring organizations (the "Sponsors") of the Debtor. Members must belong to a Sponsor in order to enroll in the Debtor.

The Debtor was formed pursuant to a Master Trust Agreement (the "Master Trust Agreement"). The Master Trust Agreement was amended and restated as of March 22, 2018. Pursuant to the Master Trust Agreement, Members are required to make contributions sufficient to maintain a contributed reserve in the amounts which the Trustees determine are appropriate and necessary. Pursuant to the Master Trust Agreement and applicable New Jersey Law, employers that participate in a MEWA remain individually, severally, and proportionately liable for any financial deficiency that may arise in the event the MEWA is unable to meet its financial obligations to claimants or medical service providers, or as directed by an appropriate governmental department, commission or agency, or order of the court. Each Member was required to sign a participation contract acknowledging this contingent liability.

### 1.5.    Debtor's Assets.

The Debtor's Official Form 206A/B [Doc 1] and the amendments thereto [Doc 59] list the Debtor's best estimation of its assets as of the Petition Date. However, those estimates are subject to adjustment in light of the daily fluctuations discussed above and below. Similarly, the valuations provided within are provided for illustrative purposes only and are susceptible to adjustment.

The Debtor's assets (the "Assets") consist of cash health care fees and reserves received from Members (the "Cash") and accounts receivable (the "Receivables") for future health care fees and reserves due from Members.

As of the Petition Date, the Debtor listed the value of the Cash and Receivables in its Official Form 206A/B, Part 1 ($5,061,147.05) and Part 3 ($1,241,889.00), respectively.

The Debtor's Cash position fluctuates significantly based upon the funding requests received daily from Aetna. Receivables are based upon the proportionate Member health care fees calculated by Windsor and assessed against the Members.

### 1.6.    **Debtor's Liabilities.**

The Debtor's Official Form 206D and 206E/F [Doc 1] and the amendments thereto [Doc 59] list the Debtor's best estimation of its liabilities as of the Petition Date. However, those estimates are subject to adjustment in light of the daily fluctuations discussed above and below. Similarly, the valuations provided within are provided for illustrative purposes only and are susceptible to adjustment.

The Debtor has no secured debt and, except for approximately $206,000 in a custodial account with NJ DOBI, none of its assets serve as collateral for any obligation.

The Debtor listed $1,726,938.42 in general unsecured nonpriority debts consisting of $1,669,022.64 in outstanding funding requests due Aetna for payment of medical and prescription claims.  The balance of less than $100,000 consisted of outstanding vendor claims. As a result of the daily funding requests from Aetna, it was later reconciled that the outstanding funding requests due Aetna as of the Petition Date totaled $3,122,423.97. On June 10, 2021, the Court entered an order authorizing the Debtor to assume the Aetna MSA and fund the outstanding prepetition funding requests. [Doc 40] As of (or around the date of) this filing, the outstanding funding requests due Aetna total approximately $0.00.

As of or around July 9, 2021, Aetna began "pending" the medical claims received from the medical service providers (i.e. doctor's office, etc.) (the "Pended Claims"). The Pended Claims have not been validated or assessed by Aetna. Once a claim is validated ("adjudicated" in Aetna's parlance), Aetna will apply a significant discount based upon the agreement between that provider and Aetna.  As of shortly before the Plan was filed, the Pended Claims totaled a *contingent and approximate* amount of $57 million dollars in submitted charges.  Based on the historical application of the provider discounts, that number is likely to result in actual funding requests lower by 70% to 80%.

The Debtor listed brokers' claims for potential commissions as unknown since those amounts had not been reconciled as of the Petition Date.  As of this filing, the prepetition broker commissions total approximately $1,438,410.

The Debtor's schedules list no priority claims. However, the Internal Revenue

Service ("IRS") filed a claim in the amount of $60,465.58 for "estimated taxes" (claim no. 2-1). The Debtor believes the IRS tax claim is susceptible to a significant reduction. Moreover, the Debtor filed a complaint against the IRS for the recovery of approximately $9 million in health insurance tax ("HIT") payments (the "HIT Complaint"). [Adversary Proceeding No.: 21-01318-MBK, Doc 1]

### 1.7.    Current and Historical Financial Conditions.

On the Petition Date, the Debtor filed a balance sheet [Doc 5], cash flow for the four (4) months ending April 30, 2021 [Doc 6], statement of operations for the four (4) months ending April 30, 2021 [Doc 7] and its 2019 tax returns [Doc 8]. The Debtor's 2020 tax returns are on extension and will be filed.

In 2019, the gross revenue of the Debtor was $219,919,417.00.  The gross revenue in 2020 was $222,598,793.00. Through mid-2020, the Debtor maintained sufficient statutory reserves. In late November 2020, Concord determined, after finalizing the October 2020 financials, that the Debtor was going to be below the statutory risk-based capital level, as of October 31, 2020.  Upon being informed of the foregoing, the Debtor's Board of Trustees evaluated options and determined that the best option that would allow the Debtor to continue operating with the least impact on the Covered Lives was to pursue capital resources. Other options were considered, including assessing Members for the shortfall.

The Debtor held its rate flat for its July 2019, October 2019, and January 2020 renewals in anticipation of a transition to Aetna providing third party administration. The estimates that the Debtor received from its consultants were that the Aetna discounts and improved medical management would yield 8% in savings, offset by 1% in administrative fees, for a net 7% expense reduction. In addition to the transition to Aetna's administration services, the Debtor applied a 5.5% COVID-19 surcharge, beginning February 1, 2021, to help resolve the capital shortfall.

As of this filing, the Debtor has $0.00 in outstanding claim funding obligations to Aetna. The Debtor has $3,~~800,547~~398,479 (as of ~~July 21~~December 7, 2021) in its bank accounts, future rebates available to offset Aetna claim funding requests, and $~~3,250,20~~21,402,131.36 in amounts due from ~~Members in accounts~~reinsurers. In addition, Debtor has $11,765,287 in member receivables~~.~~ (comprised of delinquent premiums and unpaid assessments).

### 1.8.    Events Leading to the Filing of the Bankruptcy Case.

A contributing factor to the Debtor's filing was NJ DOBI's demand that the Debtor surrender its Certificate of Registration due to the Debtor's COVID-19 related surplus depletion.  In the first quarter of 2020, the Debtor began to see the results of its improvements concerning Aetna's services and rates. Claims for the first quarter of 2020 were 15.1% below the 2019 average.  However, by March of 2020, the pandemic arrived.

During the months of April, May and June 2020, claims reduced further as a result of the COVID-19 shutdown of the State of New Jersey. Unfortunately, in July of 2020, claims rose to the highest level the Debtor had ever seen. Claims have continued at this level and have not subsided.

As most of the Covered Lives are essential workers, the claims related to COVID-19 are much higher than those in other segments of the population. For example, nursing homes, assisted living facilities, hospice facilities, and senior living facilities submitted thousands of claims for COVID-19 tests.

In addition to the foregoing, the Debtor was advised by Aetna, in March 2020, that Aetna was requiring its clients to cover 100% of all telemedicine visits, whether COVID-19 related or not, with no member cost share. The foregoing resulted in an unanticipated expense in excess of $1 million.

Another unanticipated hit to the Debtor's cash flow was the approximately $9 million in HIT payments assessed by the IRS, including a $3.27 million assessment in August of 2020. The Debtor believes that MEWA's (like the Debtor) were arbitrarily included under the HIT provisions enacted as part of the Patient Protection and Affordable Care Act (the "ACA"), PL 111-148, March 23, 2010, 124 Stat. 119, and should not have been subject to this tax. The Debtor obtained a legal opinion from an expert involved in drafting the legislation who believes that the Debtor was improperly assessed these taxes. On July 26, 2021, the Debtor file the HIT Complaint in order to recover nearly $9 million in improperly assessed taxes under § 505 of the Bankruptcy Code.

During the week of November 29, 2020, representatives of the Debtor contacted NJ DOBI to request guidance concerning the financial condition of its Members and their ability to cure any statutory capital shortfall. A meeting with DOBI was held, on December 4, 2020, to discuss the situation. The Debtor was trying to avoid saddling thousands of small businesses employing 35,000 people across New Jersey with gargantuan health plan costs resulting directly from the COVID-19 pandemic or risking an interruption in the respective 35,000 individuals' medical coverage.

On December 9, 2020, NJ DOBI issued a letter documenting NJ DOBI's request for a corrective action plan on or before January 7, 2021. NJ DOBI required the deficiency to be cured within 90 days. At that time, the deficiency (a statutory requirement for minimum reserves over which, the Debtor understands, NJ DOBI has some discretion) was approximately $19,240,000.

During the months of January, February, March, April and May of 2021, the Debtor

discussed with NJ DOBI their concerns and explained the practical realities faced by the Debtor and its Members. The Debtor would not be able to compel its Members to contribute the funds necessary to correct the shortfall in 90 days.

By letter dated May 6, 2021, NJ DOBI continued to assert that the financial condition of the Debtor remained inadequate. NJ DOBI requested the Debtor surrender its Certificate of Registration, immediately cease writing new business, and provide NJ DOBI with a plan to minimize the impacts on the Covered Lives going forward.

Thousands of employers and tens of thousands of their employees (all in New Jersey) rely upon the Debtor to provide medical, prescription, and dental coverage. Since NJ DOBI's May 6, 2021 letter, the Board of Trustees worked feverishly to explore alternatives. There had been some hope that outside funding would become available to provide the Debtor with sufficient reserves for it to continue to operate and provide services to the Covered Lives. As of this filing, the Debtor has been advised that there is little political will in the legislature or the administration to assist the Debtor or its Members in this regard.

The Debtor had been advised by Concord and the actuaries at Windsor, that, if the Debtor continued to operate, the projected underfunding would have been resolved by October 2021 with rate adjustments to current membership. If the Debtor were forced to cease operations, the underfunding likely would be substantially larger. Recently obtained projections (which are subject to adjustment) shows that the actual underfunding could be as much as $24,893,192.

The Debtor has a statutory and fiduciary duty to assess proportionate liability for the underfunding against the Members. An assessment (with ample time to collect) in order to restore statutory reserves would have been an obtainable objective. However, an assessment resulting from a wind down (with the precipitous loss of health care fees from less risky membership, but the continued obligation to cover claims of the riskier Covered Lives who are unable to find alternative coverage) would be exponentially higher. The Debtor feared this would drive many Members out of business, result in the loss of jobs, require that failed Member's proportionate share to be spread over the remaining Members, and introduce other severe economic impacts. Moreover, and frighteningly, it risks casting the Covered Lives adrift without health coverage.

It was determined that the filing of a Chapter 11 petition was the best step available for the Debtor to protect the Covered Lives, and in the worst-case scenario, provide a forum to pursue the Wind Down through which the Covered Lives could be removed

from the Debtor's rolls, and reduce the resulting economic impact to the Member employers.

### 1.9.  Significant Events During the Bankruptcy Case.

The Debtor filed this case on May 24, 2021. [Doc 1] On the same date, or shortly after, the Debtor moved to retain Genova Burns, LLC ("Genova") as bankruptcy counsel [Docs 4 and 58], WithumSmith + Brown, PC ("Withum") as its accountant [Docs 10 and 63], Windsor Strategy Partners, Inc. ("Windsor") as actuaries [Docs 17 and 57], and Concord as professional administration services [Doc 96]. On June 15, 2021, the Debtor moved to retain Hueston McNulty, PC as special counsel for collection matters. [Docs 48 and 74] On June 29, 2021, the Debtor moved to retain Cooper Levenson, P.A. as special counsel for lobbying purposes. [Doc 75 and 84] On July 1, 2021, the Debtor moved to retain CC Law & Policy as its expert witness for the prosecution of the HIT Complaint. [Docs 80 and 92]

On May 25, 2021, Brian W. Hoffmeister, Esq. was appointed as Subchapter V Trustee (the "Sub V Trustee"). [Doc 14] The Debtor's initial debtor interview was held on June 16, 2021. The Debtor's § 341 Meeting of Creditors was held on June 24, 2021.

On June 3, 2021, the Debtor filed its "first day" motions, including: (i) a *Motion for Authorization to Maintain Existing Bank Accounts and Cash Management System* [Docs 21 and 39]; (ii) *Motion to Assume the Independent Plan Management Service Agreement with Concord Management Resources* [Doc 22]; *Motion to Assume the Master Services Agreement with Aetna Life Insurance Company and Authorizing the Debtor to Fund Aetna's Prepetition and Postpetition Funding Requests on Account of the Debtor's Self-Insured Medical and Prescription Claim Obligations Incurred Pre and Postpetition* [Docs 23 and 40]; and a related *Motion to Seal the Master Services Agreement with Aetna Life Insurance Company.* [Docs 24 and 41]

On June 18, 2021, the Debtor moved to authorize the renewal of its administrative software vendor, Diligent Corporation. [Docs 52 and 81]

On June 22, 2021, the Debtor filed amended Schedules E and F. [Docs 59 and 60]

On July 6, 2021, the Debtor filed a *Motion for the Entry of an Order Establishing Procedures for the Allowance of Interim Compensation and Reimbursement of Expenses of Professionals*. [Doc 83]

On June 24, 2021, NJ DOBI filed a letter addressed to Lawrence Downs, the Chairman of the Board of Trustees for the Debtor, denying the renewal of the Debtor's registration. Reluctantly, and shortly thereafter, the Debtor agreed to surrender its registration and wind down.

The Debtor's efforts to protect the Covered Lives and its Members is the paramount reason for this Case. The Debtor has received very little guidance from regulators with regard to stated deficiencies in the corrective action plan presented prepetition or any of the wind down plans.

After NJ DOBI filed its refusal to renew the Debtor's registration (which was also posted on NJ DOBI's website) the Debtor was flooded with requests for information. However, the Debtor was unable to issue communications to its Members, the Covered Lives, and the brokers without prior approval from NJ DOBI. These delays have resulted in the Debtor's inability to notify the Covered Lives that alternative coverage was necessary by a date certain, enrolled Members would receive a rate increase (thereby delaying the rate increase and increased premium collection), and fostered an atmosphere of confusion.

Moreover, since NJ DOBI's June 24th letter, Members who contacted NJ DOBI for information– were advised to take steps inconsistent with essential provisions of the Master Trust and related controlling documents. For example, brokers and Members were told that they could terminate mid-month. However, the Debtor does not have the administrative capability to terminate Members mid-month. The resulting confusion has caused many Members to stop their automatic premium withdrawals, and the Debtor suspects there have been and will be resulting delays on collection of health care fees.

The reduction in the collection of health care fees has resulted in a strained ability to remain current on the claims from the providers. As of this filing, Aetna has agreed to apply $2 million in rebates to offset the funding requests but still has not confirmed its release of additional rebates the Debtor believes are owed, and has begun placing claims in a suspended "pending" status.  The Debtor is taking all steps, including expediting the release of information to the Members, Covered Lives, and brokers, to ensure a prompt collection of health care fees and assessments to avoid any risk of Aetna terminating its agreement with the Debtor and shutting down the processing of prescription claims. The Debtor has authorized Aetna to continue to apply available rebates to the claim funding requests.

On August 5, 2021, the Debtor moved to expand the scope of the Sub V Trustee's powers. [Docs 109 and 126] The Court granted the Debtor's motion by order entered November 15, 2021 (the "Sub V Trustee Order"). [Doc 206]

As set forth in more detail therein, the Sub V Trustee Order authorizes the Sub V Trustee to review available documents and records from the past six (6) years (the "Evaluation Period") in order to assess the impact that the COVID-19 pandemic had on claims costs, as well as evaluate non-COVID-19 claim costs.

Furthermore, the Sub V Trustee is authorized to investigate the Debtor's actuarial professional's rating methodology for the Examination Period. Finally, the Sub V

Trustee is authorized to review the Debtor's administrative expenses for the Examination Period.

On or about November 24, 2021, the Debtor and Aetna documented an agreement stipulating to Aetna's role as a third-party claims administrator, the parties' reciprocal continuing obligations pursuant to the Aetna MSA, and accommodations through the Outside Date (the "Aetna Stipulation"). The Debtor's motion to approve the Aetna Stipulation is pending a hearing scheduled for December 16th.

### 1.10. Projected Recovery of Avoidable Transfers

The Debtor has not yet completed its investigation with regard to all prepetition transactions. The HIT Complaint could result in a substantial recovery of nearly $9 million dollars from the IRS.

### 1.11. Collection of Assessment from Members

The Debtor, its professionals, or any professionals later retained, shall continue their collection efforts in compliance will all applicable statutes and regulations, or contractual obligations.

## ARTICLE 2
## THE PLAN

The Debtor's Plan describes how its Creditors will be paid. Certain Claims are entitled to specific treatment under the Bankruptcy Code and are not placed in a class for purpose of payment. For example, Administrative Expenses and Priority Tax Claims are not classified.

As required by the Code, the Plan places Claims and Equity Interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of Claims or Equity Interests is impaired or unimpaired. A Claim or Equity Interest can be impaired if the Plan alters the legal, equitable or contractual rights to which the Claimants are otherwise entitled. If the Plan is confirmed, each Creditor's recovery is limited to the amount provided in the Plan.

Only Creditors in classes that are impaired may vote on whether to accept or reject the Plan, and only Creditors holding Allowed Claims may vote. A class accepts the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Allowed Claims that actually vote, vote in favor of the Plan. Also, a class of Equity Interest holders accepts the Plan when at least two-thirds (2/3) in amount of the allowed Equity Interest holders that actually vote, vote in favor of the Plan. A class that is not impaired is deemed to accept the Plan.

### 2.1. Unclassified Claims.

Certain types of Claims are automatically entitled to specific treatment under the

Code.  For example, Administrative Expenses and Priority Tax Claims are not classified. They are not considered impaired, and holders of such Claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code.  As such, the Plan does not place the following Claims in any class:

A.      Administrative Expenses

The Debtor must pay all Administrative Expenses in full.   If an Administrative Expense is disputed, the Bankruptcy Court must determine the validity and amount of the Administrative Expense, or in other words, "allow" the Administrative Expense.  Any Administrative Expense that is undisputed and is due and owing on the Confirmation Date must be paid in accordance with this Plan, or upon such other terms as agreed upon by the Debtor and the Administrative Claimant or court order. If the Administrative Expense is disputed, payment will be made after the Administrative Expense is allowed by the Bankruptcy Court.

There are several types of Administrative Expenses, including the following:

1.  If the Debtor trades in the ordinary course of business following its filing of the Chapter 11 Case, Creditors are entitled to be paid in full for the goods or services provided.  This ordinary trade debt incurred by the Debtor after the Petition Date will be paid on an ongoing basis in accordance with the ordinary business practices and terms between the Debtor and its trade Creditors.

2.  If the Debtor received goods it has purchased in the ordinary course of business within 20 days before the Petition Date, the value of the goods received is an Administrative Expense.

3.  Administrative Expenses also include any post-petition fees and expenses allowed to professionals, including the allowed claim of the Trustee for fees and/or reimbursements, and for attorneys and accountants employed upon Bankruptcy Court authority to render services to the Debtor during the course of the Chapter 11 cases. These fees and expenses must be noticed to Creditors and approved by the Bankruptcy Court prior to payment.

The following chart lists the Debtor's estimated Administrative Expenses, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses arising in the ordinary course of business after the Petition Date | The Debtor's ordinary course claims have been substantially paid in full, except for administrative and Run-Out fees due Aetna and Run-Out fees due Concord.<br><br>Administrative and Run-Out fees due are approximately $3,646,094.39, comprised of:<br><br>Concord Run-Out ($1,277,315.22): Aetna Run-Out ($1,831,~~167.33~~149); and Aetna Admin ($~~537,611.84~~250,000) | Payment through the Plan as follows: The Debtor will pay all ordinary course claims in accordance with, but no later than the later of: (i) the Effective Date of Plan; (ii) on a date mutually agreed upon between the Debtor and the creditor; (iii) the entry of a final order allowing the claim; or (iv) after collection of the assessment and any outstanding health care fees. |
| Administrative Tax Claim | The Debtor is current with postpetition taxes. | Payment through the Plan as follows: The Debtor will pay all Allowed Claims in accordance with, but no later than the later of: (i) the Effective Date of Plan; (ii) on a date mutually agreed upon between the Debtor and the creditor; (iii) the entry of a final order allowing the claim; or (iv) after collection of the assessment and any outstanding health care fees. |
| The value of goods received in the ordinary course of business within 20 days before the Petition Date | None. | Payment through the Plan as follows: N/A |

| Professional fees, as approved by the Bankruptcy Court | Professional fees for Debtor's:<br><br>(*Current estimates*)<br><br>Bankruptcy counsel at Genova Burns ~~are estimated: total billed~~ to ~~be $250,000.~~date: $742,420.23; total received to date: $455,849.88; total outstanding: $286,570.15.<br><br>Accountants at Withum are estimated to be $~~34~~150,000.<br><br>Actuaries at Windsor are estimated to be $~~21,100~~32,080.<br><br>Professional Administration at Concord are estimated to be $~~50~~150,000 through the end of the case ~~(exclusive of the Run-Out fee of $1,277,315~~.<br><br>Special counsel for collection matters at Hueston McNulty, PC are estimated to be less than $100.<br><br>Special counsel for lobbying at Cooper Levenson, P.A. are estimated to be $20,000, through the end of the case.<br><br>Expert witness services at CC Law & Policy are estimated to be $~~10,000~~21,535 | After Bankruptcy Court approval of a fee application, payment through the Plan as follows:<br><br>The Debtor will pay all allowed fees in accordance with, but no later than the later of: (i) the Effective Date of Plan; (ii) on a date mutually agreed upon between the Debtor and the creditor; (iii) the entry of a final order allowing the fees; or (iv) after collection of the assessment and any outstanding health care fees. |
| Clerk's Office fees | Clerk's Office fees are estimated to be $0.00, or nominal. | Paid in full on the Effective Date or as soon as practicable thereafter. |

| | | |
|---|---|---|
| Other Administrative Expenses | None known. | Payment through the Plan as follows: The Debtor will pay all allowed expenses in accordance with, but no later than the later of: (i) the Effective Date of Plan; (ii) on a date mutually agreed upon between the Debtor and the creditor; (iii) the entry of a final order allowing the expenses; or (iv) after collection of the assessment and any outstanding health care fees., and payment of all adjudicated Medical and Pharmacy Claims in the ordinary course as set forth herein (including Article VI of this Plan). |
| Subchapter V Trustee | Trustee fees, including the investigation detailed in the Sub V Trustee Order, are estimated to be $25150,000. | Upon application under § 330 and after Bankruptcy Court approval, payment through the Plan as follows: PaymentThe Debtor will pay all allowed fees in fullaccordance with, but no later than the later of: (i) the Effective Date of Plan,; (ii) on a date mutually agreed upon between the Debtor and the creditor; (iii) the entry of a final order allowing the fees; or as soon as practicable thereafter.(iv) after collection of the assessment and any outstanding health care fees.. |
| Subchapter V Trustee Professionals | | Upon application under § 330 and after Bankruptcy Court approval, payment through the Plan as follows: The Debtor will pay all allowed fees in accordance with, but no later than the later of: (i) the Effective Date of Plan; (ii) on a date mutually agreed upon between the Debtor and the creditor; (iii) the entry of a final order allowing the fees; or (iv) after collection of the assessment and any outstanding health care fees. |

B.      Priority Tax Claims.

Priority Tax Claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code.  Unless the holder of such a § 507(a)(8) Priority Tax Claim agrees otherwise, it must receive the present value of such Claim, in regular installments paid over a period not exceeding 5 years from

the order of relief.

Each holder of a Priority Tax Claim will be paid as set forth in the chart below:

| Name of Taxing Authority and Type of Tax | Estimated Amount Owed | Date of Assessment | Treatment |
|---|---|---|---|
| Internal Revenue Service: "estimated" income and excise taxes; Patient-Centered Outcomes Research Institute Fee ("PCORI"). | The IRS has filed a claim in the amount of $60,465.58 (claim no. 2) for "estimated" income and excise taxes. 2020 returns indicate Federal Income Taxes are due are $331,849, and New Jersey Taxes (1041) are $92,772.<br><br>The Debtor's professionals have prepared a Form 720 which includes estimated PCORI, in the amount of $100,430.74. | Federal Income: tax period December 31, 2020<br><br>Excise: tax period June 30, 2021<br><br>PCORI: For the year 2020. | Payment through the Plan as follows: The Debtor will pay all allowed expenses in accordance with, but no later than the later of: (i) the Effective Date of Plan; (ii) on a date mutually agreed upon between the Debtor and the creditor; (iii) the entry of a final order allowing the expenses; or (iv) after collection of the assessment and any outstanding health care fees, and payment of all adjudicated Medical and Pharmacy Claims in the ordinary course. |

## 2.2     Classes of Claims and Equity Interests.

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

### A.  Classes of Secured Claims

Allowed Secured Claims are Claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured Claims under § 506 of the Code.  If the value of the collateral or setoffs securing the Creditor's Claim is less than the amount of the Creditor's Allowed Claim, the deficiency will be classified as a general unsecured Claim. In addition, certain claims secured only by the debtor's principal residence, may require different treatment pursuant to § 1190(3) of the Code as set forth below, if applicable.

*There are no secured claims against the Debtor's estate.*

B.  Classes of Priority Unsecured Claims.

Certain priority Claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Code are required to be placed in classes.  The Code requires that each holder of such a Claim receive cash on the Effective Date of the Plan equal to the allowed amount of such Claim. However, a class of holders of such Claims may vote to accept different treatment.

The following chart lists all classes containing Claims under §§ 507(a)(1), (4), (5), (6), and (a)(7) of the Code and their proposed treatment under the Plan:

***There are no valid or allowed claims under §§ 507(a)(1), (4), (5), (6), and (a)(7) against the Debtor's estate.***

C.  Classes of General Unsecured Claims

General unsecured Claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| 1 | General Unsecured Class | Impaired as to timing of payment. | Payment through the Plan as follows: The Debtor will pay all Allowed General Unsecured Claims in accordance with, but no later than the later of: (i) the Effective Date of Plan; (ii) on a date mutually agreed upon between the Debtor and the creditor; (iii) the entry of a final order allowing the claim; or (iv) after collection of the assessment and any outstanding health care fees~~.~~, and payment of all adjudicated Medical and Pharmacy Claims in the ordinary course as set forth herein (including Article VI of this Plan). |

D.  Classes of Equity Interest Holders.

Equity Interest holders are parties who hold an ownership interest (*i.e.*, equity interest) in the Debtor.  In a corporation, entities holding preferred or common stock are Equity Interest holders.  In a partnership, Equity Interest holders include both general and limited partners.  In a limited liability company ("LLC"), the Equity Interest holders are the members.  Finally, with respect to an individual who is a debtor, the Debtor is the Equity Interest holder.

***There are no Equity Interest Holders.***

**2.3**.    **Estimated Number and Amount of Claims Objections.**

The Debtor may object to the amount or validity of any Claim within ~~60~~180 days of the Confirmation Date by filing an objection with the Bankruptcy Court and serving a copy of the objection on the holder of the Claim. The Claim objected to will be treated as a Disputed Claim under the Plan.  If and when a Disputed Claim is finally resolved by the allowance of the Claim in whole or in part, the Debtor will pay the Allowed Claim in accordance with the Plan.

| ~~Class/Claim Basis~~ | ~~Number of Claims Objected To~~ | ~~Amount of Claims Objected To~~ |
|---|---|---|

| 1 | 5 (claim nos. 3 – 7) | $3.8 million |

The vast majority of proofs of claim filed are attributable to pending Medical Claims. This Plan provides for the full payment of all Medical Claims in the ordinary course. While the Debtor generally acknowledges responsibility for all Medical and Pharmacy Claims, until the Debtor's third-party claims administrator adjudicates those claims, the Debtor cannot know which claims are authorized. Upon funding all Batches of adjudicated Medical Claims, as well as all Pharmacy Claims, in accordance with the Debtor's agreement with Aetna, most of the obligations underlying the filed proofs of claim will have been resolved. Notwithstanding, the Debtor reserves the right to object to any scheduled or filed proofs of claim.

### 2.4. Treatment of Executory Contracts and Unexpired Leases.

Executory Contracts are contracts where significant performance of the contract remains for both the Debtor and another party to the contract.  The Debtor has the right to reject, assume (i.e. accept), or assume and assign these types of contracts to another party, subject to the Bankruptcy Court's approval.  The paragraphs below explain the Debtor's intentions regarding its Executory Contracts (which includes its unexpired leases) and the impact such intentions would have on the other parties to the contracts.

**Rejection of Executory Contracts and Unexpired Leases.**

AllThe Debtor shall have until 180 days after the Effective Date to determine whether any executory contracts or unexpired leases in which the Debtor has an interest that have not previously been assumed or rejected, whether listed in the Debtor's Official Form 206G or not, shall be assumed or rejected by the Debtor. Further, (the "Assumption Deadline"). The Debtor will be conclusively deemed to have rejected all executory contracts and/or unexpired leases not assumed before the date of the order confirming the PlanAssumption Deadline.

Rejection means that the Debtor has elected not to continue to perform the obligations under such contracts or leases.  If the Debtor has elected to reject a contract or lease, the other party to the contract or lease will be treated as an unsecured Creditor holding a Claim that arose before the bankruptcy was filed. Assumption of a lease or contract requires the Debtor to cure any defaults and provide adequate assurance that the Debtor can keep its obligations thereunder.

**The deadline for filing a proof of claim based on a claim arising from the rejection of an Executory Contract or Unexpired Lease is 30 days after entry of an order confirming the Plan rejecting that contract or lease, or by operation of the Plan upon expiration of the Assumption Deadline.**  Any Claim based on the rejection of an Executory Contract or Unexpired Lease will be barred if the proof of claim is not timely filed unless the Bankruptcy Court orders otherwise.

### 2.5. Means for Implementation of the Plan.

The Wind Down provides for the termination of all coverage no later than the Coverage End Date (December 31, 2021). The Wind Down and the Plan will be funded by enrolled member health care fees, as well as assessments of current and former members enrolled as early as January 1, 2020.

***Pursuant to N.J.S.A. 17B:27C-7 (d), member assessments shall cover all incurred but unpaid medical claims and all projected medical claims, together with the costs and expenses of collecting the assessments, a reasonable loading factor for uncollected assessments and the costs and expenses of the Wind Down and Plan. As such, upon receipt of the respective health care fees and assessments, the Debtor anticipates that all creditors and claims will be paid in full.***

On Confirmation of the Plan, all property of the Debtor will revert, free and clear of all Claims except as provided in the Plan, to the Debtor. The Debtor expects to have sufficient cash on hand to make all administrative and priority payments required in the Plan, except for any funding requests due Aetna, upon collection of the assessment and any delinquent health care fees. The Debtor anticipates having the ability to pay any outstanding Aetna funding requests and Pended Claims upon collection of any outstanding health care fees and assessments.

***If it has been discovered that the collection of assessments and heath care fees results in a surplus of funds after payment of all claims or interests, the surplus shall be returned to the Members who have paid all premiums, assessments, and other healthcare fees.***

### 2.6.    Payments.

Whether the Plan is confirmed under §1191(a) or (b), payments to Creditors provided for in the Plan will be made by the Debtor pursuant to §1194(a). The Debtor shall make Plan payments as provided for in the Plan or in the order confirming the Plan.

### 2.7.    Post-Confirmation Management.

The Debtor's current management shall continue to serve post-confirmation. After the Confirmation Date, the Debtor shall not be required to seek prior Court authorization to retain or pay professionals or expenses in furtherance of its efforts to enact the provisions of this Plan.

### 2.8.    Tax Consequences of the Plan.

***Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.***

Creditors should consult their own tax professionals to consider the consequences of any discharge, and the general tax consequences of the receipt of distributions under the Plan.

**2.9. Projections in Support of Debtor's Ability to Make Payments Under the Proposed Plan**

Debtor has provided projected financial information. Those projections are listed in **Exhibit "D."**

### ARTICLE 3
### FEASIBILITY OF PLAN

**3.1.    Ability to Initially Fund Plan**.

The Debtor believes that it will have enough cash on hand, upon collection of any assessment and health care fees, to pay all Administrative Expenses, Priority Tax Claims, professional fees, and Allowed Claims.   Tables showing the amount of cash on hand on the Effective Date of the Plan, and the sources of that cash, are attached hereto as **Exhibit "B"**.

**3.2.    Ability to Make Future Plan Payments And Operate Without Further Reorganization**.

The Debtor is liquidating under this Plan and will not require further reorganization.

### ARTICLE 4
### LIQUIDATION ANALYSIS.

To confirm the Plan, the Bankruptcy Court must find that all Creditors and Equity Interest holders who do not accept the Plan will receive at least as much under the Plan as such Claimants and Equity Interest holders would receive in a Chapter 7 liquidation.  The Debtor refers to **Exhibit "C"** to serve as its liquidation analysis.

Upon collection of any outstanding health care fees and assessments, the Creditors shall be paid in full according to the Plan.

*While the liquidation recovery in a chapter 7 can be projected to be 100% based upon the statutory requirement that Members cover all shortfalls, a shift to a chapter 7 liquidation is likely to result in a termination of Concord's services (making administration of any recovery from Members exponentially more expensive and difficult) and a termination of the service agreement with Aetna (making administrative claims processing and payment exponentially more expensive and difficult, and will also result in a loss of provider discounts negotiated by and between Aetna and the providers). This will ~~more than double~~significantly increase the actual, noncontingent, claim exposure. The increased costs associated with the administration and claim exposure~~,~~ will require an exponentially higher*

*assessment to be charged against the Members. This significantly reduces the likelihood that the full assessment is collected, or that the total amount of elevated claims is covered.*

## ARTICLE 5
## NO DISCHARGE OF DEBTOR.

**5.1.  No Discharge**.

In accordance with § 1141(d)(3) of the Bankruptcy Code, the Debtor will not receive any discharge of debt in this bankruptcy case.

## ARTICLE 6
## TREATMENT OF PENDED MEDICAL CLAIMS

On and after the Effective Date, Aetna shall process Pended Claims in accordance with, and subject to the terms of, this Article 6, the Aetna MSA, the Debtor's Instructions, and any Applicable Orders.  In the event of any conflict between the provisions of this Plan and the terms of the Aetna MSA, the provisions of this Plan shall govern, unless explicitly ordered otherwise by the Bankruptcy Court via an Applicable Order.

**6.1    Processing of Medical Claims.**

**6.1.1**        On the Effective Date, and from time to time thereafter, the Debtor shall remit to Aetna a Prefund Amount on account of Pended Claims to be adjudicated pursuant to the Debtor's Instruction.  The Prefund Amount shall be used and applied by Aetna solely to satisfy Medical Claims per the Debtor's Instructions. Upon transmittal of the Prefund Amount, the Debtor shall provide to Aetna the Debtor's Instructions for processing a Batch of Pended Claims to be paid from the Prefund Amount.  Upon receipt of the Prefund Amount, Aetna shall process and pay the specified Batch of Medical Claims with the Prefund Amount in accordance with the Debtor's Instructions, provided, however, that if Aetna determines that the existing Prefund Amount is insufficient to satisfy the Medical Claims in the Batch, Aetna shall request from the Debtor, and the Debtor shall provide, sufficient additional Prefund Amounts or revised Debtor's Instructions (which instructions may include a demand by the Debtor that Aetna return any unused Prefund Amounts). Upon receipt of additional Prefund Amounts or revised Debtor's Instructions, Aetna shall continue to process and pay pended Medical Claims in accordance with the Debtor's Instructions (revised or otherwise, and subject to Aetna having received sufficient Prefund Amounts) until the earliest of: (i) complete funding of all Medical Claims, (ii) the occurrence of an Event of Default under this Article of the Plan, or (iii) the occurrence of the Outside Date.  Aetna shall be entitled to rely on the Debtor's Instructions to process and pay Medical Claims without independent investigation or need for further verification.

**6.1.2**        Aetna shall not be liable to any person or party, including the Debtor, healthcare providers, Members, Covered Lives, the United States Department of

Labor, or the New Jersey Department of Banking and Insurance under ERISA and/or the Self-Funded Multiple Employer Welfare Arrangement Regulation Act  for any issue arising with respect to the manner in which Aetna processes or funds Medical Claims during the Chapter 11 Case or subsequent to the Effective Date, so long as Aetna acted (or acts) in good faith and  substantially pursuant to the Debtor's Instructions, this Plan, any Applicable Orders, or the terms of the Aetna MSA.

**6.1.3**        Aetna shall not be responsible for any consequences resulting from the Debtor's failure to fund or untimely funding of any Medical Claims as long as Aetna acted (or acts) in good faith and substantially pursuant to the Debtor's Instructions, this Plan, any Applicable Orders, or the terms of the Aetna MSA.

**6.1.4**        The twelve (12) month runoff period under the MSA shall be deemed to begin at 12:01 a.m. on January 1, 2022.

**6.2**   **Rebates.**

Subject to mutual agreement between the Debtor and Aetna, Aetna shall be authorized to apply any pharmacy rebates accrued or otherwise earned (whether or not presently payable) by the Debtor under the terms of the Aetna MSA to fund Medical Claims.  Upon such agreement, the Debtor shall direct in the Debtor's Instructions the applicable pharmacy rebate amount to be utilized as part of a Prefund Amount, provided that Aetna shall have no obligation to accelerate rebates in excess of amounts collected as of the date of the Debtor's Instructions, and Aetna may decline to accelerate rebates in an amount up to $500,000.  Any pharmacy rebates not used to fund Medical Claims shall be paid over to the Debtor pursuant and subject to the terms of the Aetna MSA.

**6.3**   **Aetna Fees.**

On or before December 31, 2021, the Debtor shall pay to Aetna (or Aetna shall receive payment via offset against pharmacy rebate amounts) the Runoff Fee. On or before the Effective Date, the Debtor shall pay to Aetna (or Aetna shall receive payment via offset against pharmacy rebate amounts), the following amounts:

i.        The Service Fee; and

ii.       The Special Fee.

**6.4**   **Exculpation**.

**Notwithstanding anything herein or in the Confirmation Order to the contrary, upon the Effective Date, the Aetna Parties shall neither have nor incur, and the Aetna Parties are hereby released and exculpated from, any liability for any act or omission, arising after the Petition Date, in connection with, relating to, or arising out of Aetna's performance under or compliance with the Aetna MSA, the Settlement and Mutual Release Agreement, this Plan, the Applicable**

**Orders, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Plan, the pursuit of confirmation or consummation of the Plan, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, negotiations regarding or concerning any of the foregoing, except for any actions determined by final order to have constituted bad faith, gross negligence, or willful misconduct. This exculpation provision extends to all creditors and parties-in-interest in this bankruptcy case to the fullest extent permissible under applicable law.**

**6.5**   **Events of Default and Termination.**

Without limiting the events of default under the Aetna MSA, each of the following shall constitute an event of default and shall grant to Aetna the right to terminate its obligations under the Aetna MSA and this Plan upon fourteen (14) days' written notice to the Debtor without the need for any further order of this Bankruptcy Court:

i.   Failure by the Debtor to pay any of the Service Fee or the Special Fee on or before the Effective Date;

ii.   Failure by the Debtor to pay the Runoff Fee on or before December 31, 2021.

iii.   Failure by the Debtor to cause the Effective Date to occur on or before January 15, 2022 (unless otherwise consented to in writing by Aetna, and which consent shall not be unreasonably withheld);

iv.   Failure by the Debtor to fund Pharmacy Claims as and when due, in accordance with the Aetna MSA;

v.   Failure by the Debtor to fund at least $5,000,000 toward Pended Claims as Prefund Amounts (exclusive of any pharmacy rebates applied) from the Effective Date of the Plan to March 31, 2022;

vi.   Failure by the Debtor to complete funding of all Medical Claims by the Outside Date; and

vii.   Failure by the Debtor to comply with its other material obligations under the terms of this Plan and the Applicable Orders.

Upon termination by Aetna under this Article, Aetna shall be entitled to reject and/or deny all pending Medical Claims that have not yet been processed and paid. Such termination shall not affect, limit, or terminate the exculpation, releases, and indemnity obligations set forth in this Plan, which shall survive any such termination, as long as Aetna acted (or acts) in good faith and in accordance with this Plan, any Applicable Orders, or the terms of the Aetna MSA.

**ARTICLE 7**
**SUBCHAPTER V TRUSTEE**

**7.1.**   **Subchapter V Trustee Investigation and Uncovered Insider or Professional Liability Claims.**

As set forth in more detail in the Sub V Trustee Order, and incorporated in its entirety herein, the Sub V Trustee shall investigate certain facts and circumstance which led to the Debtor's financial instability. The Sub V Trustee is authorized to review available information, including documents and records from the past six (6) years (the "Evaluation Period"), in order to assess the impact that the COVID-19 pandemic had on claims costs, as well as evaluate non-COVID-19 impacts.

The Sub V Trustee is authorized to investigate, among other things, detailed in the Sub V Trustee Order, the Debtor's actuarial professional's rating methodology for the Examination Period. Finally, the Sub V Trustee is authorized to review the Debtor's administrative expenses for the Examination Period (the "Sub V Investigation") the facts and circumstances, and other potential insider and professional claims.

Any claims, rights, or causes of action uncovered by the Investigation, which belong to the Debtor's estate, are related to insiders or professional service providers of and to the Debtor ("Insider and Professional Liability Claims"), and are determined to be in the best interests of the creditors and the Debtor's estate to recover (including Members and Covered Lives), shall be pursued by the Subchapter V Trustee, or any professional retained by the Subchapter V Trustee, or any other professional retained by order of this Court. Any claims, rights, or causes of action, which belong to the Debtor, are not Insider and Professional Liability Claims (the "Non-Insider and Professional Liability Claims"), and are determined to be in the best interests of the creditors and the Debtor's estate to recover (including Members and Covered Lives), shall be pursued by the Debtor, or any professional retained by order of this Court for that purpose.

The proceeds of any recovery of Insider and Professional Liability Claims or other claims addressed by this Article 7 shall be used to fund the repayment of all Allowed Claims.

## ARTICLE 8
## GENERAL PROVISIONS.

### 68.1.  Title to Assets.

If a plan is confirmed under § 1191(a), except as otherwise provided in the Plan or in the order confirming the Plan, (i) confirmation of the Plan vests all of the property of the estate in the Debtor, and (ii) after confirmation  of the Plan, the property dealt with by the Plan is free and clear of all Claims of Creditors.

If a plan is confirmed under § 1191(b), property of the estate includes, in addition to the property specified in § 541, all property of the kind specified in that section that

the Debtor acquires, as well as earnings from services performed by the Debtor, after the date of commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13 of the Bankruptcy Code, whichever occurs first.  Except as provided in § 1185 of the Bankruptcy Code, the Plan, or the order confirming the Plan, the Debtor shall remain in possession of all property of the estate.

### 68.2.  Binding Effect.

If the Plan is confirmed, the provisions of the Plan will bind the Debtor, Creditors, and all interested parties, whether or not they accept the Plan. The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of, the successors or assigns of such entity.

### 68.3.  Severability.

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

### 68.4.  Retention of Jurisdiction by the Bankruptcy Court.

The Bankruptcy Court shall retain jurisdiction of this case with regard to the following matters: (i) to make such orders as are necessary or appropriate to implement the provisions of this Plan and to resolve any disputes arising from implementation of the Plan; (ii) to rule on any modification of the Plan proposed under section 1193; (iii) to hear  and  allow  all  applications  for  compensation to  professionals  and  other Administrative Expenses; (iv) to resolve all issues regarding Claims  objections,  and issues arising from the assumption/rejection of executory contracts or unexpired leases, and (v) to adjudicate any cause of action which  may  exist  in  favor  of  the  Debtor, including preference and fraudulent transfer causes of action.

6

### 8.5.  Captions.

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

### 68.6.  Modification of Plan.

The Debtor may modify the Plan at any time before confirmation of the Plan pursuant to § 1193(a). However, the Bankruptcy Court may require additional items including revoting on the Plan.

If the Plan is confirmed under Section 1191(a), the Debtor may also seek to

modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

If the Plan is confirmed under Section 1191(b), the Debtor may seek to modify the Plan at any time only if (1) it is within 3 years of the Confirmation Date, or such longer time not to exceed 5 years, as fixed by the court *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

### 68.7.  **Final Decree.**

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Debtor, or such other party as the Bankruptcy Court shall designate in the Plan Confirmation Order, shall file a notice with the Bankruptcy Court to obtain a final decree to close the case. Alternatively, the Bankruptcy Court may enter such a final decree on its own motion.

### ARTICLE
### 79
### ATTACHMENTS

The following documents accompany the Plan [check those applicable, and list any other attachments here]:

[ ]      Debtor's Assets at Fair Market Value, annexed as Exhibit ____.

[ ]      Debtor's Liabilities, annexed as Exhibit ____.

[**X**]      Financial forecast for the Debtor, annexed as **Exhibit "D**."

[ ]      Debtor's most recent financial statements issued before bankruptcy, annexed as Exhibit ___.

[ ]      Debtor's most recent post-petition operating report filed since the commencement of the Debtor's bankruptcy case, annexed as Exhibit ___.

[ ]      Summary of the Debtor's periodic operating reports filed since the commencement of the Debtor's bankruptcy case, annexed as Exhibit ___.

[ ]      Executory Contracts and Unexpired Leases, to be Assumed annexed as Exhibit ___.

[ ]      Executory Contracts and Unexpired Leases to be Assumed and Assigned, annexed as Exhibit ___.

[ ]      Executory Contracts and Unexpired Leases to be Rejected, annexed as Exhibit ___.

[**X**]      Tables showing the amount of cash on hand as of the Effective Date, and the sources of that cash, annexed as **Exhibit "B."**

[**X**]      Liquidation Analysis, annexed as **Exhibit "C."**

[**X**]      Debtor's Wind Down plan as **Exhibit "A."**

## ARTICLE
## 810
## <u>FREQUENTLY ASKED QUESTIONS</u>

**What Is the Debtor Attempting to Do in Chapter 11?**  Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.  Under Chapter 11, a debtor attempts to restructure the claims held against it.  Formulation and confirmation of a plan of reorganization is the primary goal of Chapter 11.  When reorganization is not feasible, however, a debtor may propose a liquidating plan under Chapter 11.  The plan is the legal document which sets forth the manner and the means by which holders of claims against a debtor will be treated.

**Why Am I Receiving This Plan?**  In order to confirm a plan of reorganization [or liquidation], the Bankruptcy Code requires that a debtor solicit acceptances of a proposed plan, which it is doing with this Plan.  If the creditors are satisfied with the information provided in the Plan and the terms of the Plan as proposed, and have voted for the Plan and returned the requisite number of ballots to counsel for the Debtor, the Bankruptcy Court may confirm the Plan as proposed by the Debtor.

**How Do I Determine Which <u>Class</u> I Am In?**  To determine the class of your claim or interest, you must first determine whether your claim is secured or unsecured. Your claim is secured if you have a validly perfected security interest in collateral owned by the Debtor.  If you do not have any collateral, your claim is unsecured.  The Table of Contents will direct you to the treatment provided to the class in which you are grouped. The pertinent section of the Plan dealing with that class will explain, among other things, who is in that class, what is the size of the class, what you will receive if the Plan is confirmed, and when you will receive what the Plan has provided for you if the Plan is confirmed. **Section 2.2** lists all classes of claimants and their types of claims.

**Why Is Confirmation of a Plan of Liquidation Important?**  Confirmation of the Plan is necessary because if the Plan is confirmed, the Debtor and all of its creditors are bound by the terms of the Plan.  If the Plan is not confirmed, the Debtor may not pay creditors as proposed in the Plan while the Debtor remains in bankruptcy.

**What Is Necessary to Confirm a Plan of Liquidation?** Confirmation of the Plan requires, among other things, the vote in favor of the Plan of two-thirds in total dollar amount and a majority in number of claims actually voting in each voting class.  If the vote is insufficient, the Bankruptcy Court can still confirm the Plan, but only if certain additional elements are shown including that the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

**Am I Entitled to Vote on the Plan?** Any creditor of the Debtor whose claim is IMPAIRED under the Plan is entitled to vote, if either (i) the creditor's claim has been scheduled by the Debtor and such claim is not scheduled as disputed, contingent, or unliquidated, or (ii) the creditor has filed a proof of claim on or before the last date set

by the Bankruptcy Court for such filings.  Any claim to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the creditor to vote upon the creditor's motion.  Such motion must be heard and determined by the Bankruptcy Court prior to the date established by the Bankruptcy Court to confirm the Plan.

**How   Do   I   Determine   Whether   I   Am   in   an   Impaired   Class?**
Section 2.2 of the Plan identifies the classes of creditors whose claims are impaired.   If your claim is impaired, your vote will be considered by the Bankruptcy Court.

**When Is the Deadline by Which I Need to Return My Ballot?**   The Plan is being distributed to all claim holders for their review, consideration and approval.  There is no deadline by which the ballots must be returned because all Creditors are receiving payment in full under the Plan, and all Equity Interest Holders consent to their treatment proposed herein.

**How Do I Determine When and How Much I Will Be Paid?**  In Section 2.2 details the timing Creditors can expect payment. Creditors can expect payment in full of their Allowed Claim.

# ARTICLE
## 911
## DEFINITIONS

**911.1.**    The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Code are used in this Plan.  The definitions that follow that are found in the Code are for convenience of reference only and are superseded by the definitions found in the Code. Additional definitions contained in the Plan are indicated within.

**911.2.  Administrative Claimant**:  Any person entitled to payment of an Administration Expense.

**911.3.    Administrative Convenience Class**: A class consisting of  every unsecured claim that is less than or reduced to an amount that the Bankruptcy Court approves as reasonable and necessary for administrative convenience.

**911.4.    Administrative Expense**: Any cost or expense of administration of the Chapter 11 case entitled to priority under Section 507(a)(2) of the Code and allowed under Section 503(b) of the Code, including without limitation, any actual and necessary expenses of preserving the Debtor's estate, any actual and necessary expenses incurred following the filing of the bankruptcy petition by the Debtor-in-Possession, allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under the Bankruptcy Code, the allowed claim of the Trustee for fees and/or reimbursements, and any fees or charges assessed against any of the Debtor's estates under Chapter 123, Title 28, United States Code.

**911.5.  Administrative Tax Claim**:  Any tax incurred pursuant to Section 503(b)(1)(B) of the Code.

**9.6.  11.6.    Aetna Parties:**  Aetna Life Insurance Company, its current and former representatives, directors, officers, shareholders, attorneys, trustees, insurers, employees, agents, affiliates, subsidiaries, parents and related entities, predecessors, successors and assigns, and each of their respective current and former representatives, directors, officers, shareholders, attorneys, trustees, insurers, employees and agents.

**11.7.    Allowed Claim**: Any claim against the Debtor pursuant to Section 502 of the Code to the extent that: (a) a Proof of Claim was either timely filed or was filed late with leave of the Bankruptcy Court or without objection by the Debtor, and (b) as to which either (i) a party in interest, including the Debtor, does not timely file an objection, or (ii) is allowed by a Final Order.

**9.711.8.    Allowed Priority Tax Claim**: A Priority Tax Claim to the extent that it is or has become an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor or Debtor-in-Possession shall be entitled.

**11.9.8.    Allowed Secured Claim**: Allowed Secured Claims are claims secured

by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code.

9.911.10.    **Allowed Unsecured Claim**: An Unsecured Claim to the extent it is, or has become, an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor or Debtor-in-Possession shall be entitled.

9.1011.11.    **Applicable Orders:** Any Orders entered by the Bankruptcy Court in connection with the respective rights and obligations of Aetna and the Debtor under the Aetna MSA or applicable law.  For the avoidance of doubt, the [Aetna 9019 Order and the TRO (as defined in the Settlement and Mutual Release Agreement approved by the Aetna 9019 Order)] constitute Applicable Orders.

11.12.    **Bankruptcy Code or Code**: The Bankruptcy Reform Act of 1978, as amended and codified as Title 11, United States Code.

9.11.13.    **Bankruptcy Court**: The United States Bankruptcy Court for the District of New Jersey.

9.12.  11.14.    **Bankruptcy Rules**:  The Federal Rules of Bankruptcy Procedure.

9.13  11.15.    **Batch:** A selection of Medical Claims delineated by face value of billed charges (offset by applicable provider discounts) that the Debtor, pursuant to the Debtor's Instructions, instructs Aetna to process and pay with the Prefund Amount remitted by the Debtor to Aetna for such Medical Claims.

11.16.    **Cash**: Cash, cash equivalents and other readily marketable securities or instruments issued by a person other than the Debtor,  including,  without  limitation, readily marketable direct obligations of the United States of America, certificates of deposit issued by banks and commercial paper of any entity, including interest accrued or earned thereon.

9.1411.17.    **Chapter 11 Case**: This case under chapter 11 of the Bankruptcy Code in which Affiliated Physicians and Employers Master Trust d/b/a Member Health Plan NJ is the Debtor-in-Possession.

9.1511.18.    **Claim**: Any "right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or any right to an equitable remedy for future performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured." 11 U.S.C. § 101(5).

9.1611.19.    **Class**: A category of holders of claims or interests which are substantially similar to the other claims or interests in such class.

9.1711.20.    **Confirmation**: The entry by the Bankruptcy Court of an order confirming this Plan.

9.18**11.21.**    **Confirmation Date**: The Date upon which the Bankruptcy Court shall enter the Confirmation Order; provided however, that if on motion the Confirmation Order or consummation of the Plan is stayed pending appeal, then the Confirmation Date shall be the entry of the Final Order vacating such stay or the date on which such stay expires and is no longer in effect.

9.19.    **11.22.**    **Confirmation Hearing**: The hearing to be held on _____, 20__ to consider confirmation of the Plan.

9.20**11.23.**    **Confirmation Order**:  An order of the Bankruptcy Court or any amendment thereto confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

9.21**11.24.**    **Covered Lives**:    Any person covered by the Debtor's health plan.

**11.25.**    **Creditor**: Any person or entity who has a Claim against the Debtor that arose on or before the Petition Date.

9.22**11.26.**    **Debtor** and **Debtor-in-Possession**: Affiliated Physicians and Employers Master Trust d/b/a Member Health Plan NJ, the debtor-in-possession in this Chapter 11 Case.

9.23**11.27.**    **Debtor's Instructions:** Express written instructions by the Debtor to Aetna directing it to process a Batch of Medical Claims consistent with all applicable laws, regulations, and the terms of the MEWA benefit plan , and consistent with Aetna's system capabilities.  For avoidance of doubt, except as directed in any Applicable Orders or as agreed in writing by the Debtor and Aetna, all Medical Claims shall be processed in a first-in first-out basis by date of receipt by Aetna.

**11.28.**    **Disputed Claim:** Any claim against the Debtor pursuant to Section 502 of the Code that the Debtor has in any way objected to, challenged, or otherwise disputed.

9.24**11.29.**    **Distributions**: The property required by the Plan to be distributed to the holders of Allowed Claims.

9.25**11.30.**    **Effective Date**: The effective date of this Plan is the date the court enters an Order confirming this Plan.

9.26**11.31.**    **Equity** or **Equity Interest Holder**: N/A.

9.27**11.32.**    **Executory Contracts**: All unexpired leases and executory contracts as described in Section 365 of the Bankruptcy Code.

9.28**11.33.**    **Final Order**: An order or judgment of the Bankruptcy Court that has not been reversed, stayed, modified or amended and as to which (a) any appeal that has

been taken has been finally determined or dismissed, or (b) the time for appeal has expired and no notice of appeal has been filed.

9.29.   11.34.   **IRC**: The Internal Revenue Code.

~~9.30.~~        **11.35.    Medical Claims:** Medical claims for the Covered Lives that are part of the health plan offered by the Debtor.

**11.36.    Member**:   Any entity or employer who was enrolled in the Debtor's health plan any time beginning January 1, 2020 and ending December 31, 2021.

**11.37.    Outside Date**: December 31, 2022, unless otherwise agreed in writing by Aetna.

**11.38.    Petition Date**: May 24, 2021.

~~9.31.~~    **11.39.    Plan**: This Plan, either in its present form or as it may be altered, amended, or modified from time to time.

~~9.32.~~

**11.40.    Pharmacy Claim.** Pharmacy claims for the Covered Lives that are part of the MEWA.

**11.41.    Prefund Amount:** Funds that the Debtor, from time to time, remits to Aetna to fund a Batch of Medical Claims, each of which remittance shall be in an amount no less than $2,500,000 (unless otherwise consented to in writing by Aetna, and which consent shall not be unreasonably withheld).

**11.42.    Priority Tax Claim**: Any Claim entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

~~9.33.~~    **11.43.    Runoff Fee**: The amount of $1,831,149 for outstanding runoff fees under the Aetna MSA

**11.44.    Schedules**: Schedules and Statement of Financial Affairs, as amended, filed by the Debtor with the Bankruptcy Court listing liabilities and assets.

~~9.34.~~    **11.45.    Secured Creditor**: Any creditor that holds a Claim that is secured by property of the Debtor.

~~9.35.~~ **11.46    Service Fee:** The amount of $0.00 for service fees due under the Aetna MSA through December 31, 2021, which amount may be subject to adjustment or reconciliation pursuant to the terms of the Aetna MSA on or after January 1, 2022.

**11.47    Special Fee:** The amount of $250,000.00 as a special fee to reimburse Aetna for undertaking the process outlined in the Plan.

**11.48.    Trustee**: Brian W. Hoffmeister, the trustee appointed pursuant to 11 U.S.C. § 1183(a) and whose duties are prescribed under 11 U.S.C. 1183(b), the Plan, or the order confirming the Plan.

9.36. — 11.49.          **Unsecured Creditor**: Any Creditor that holds a Claim
in the Chapter 11 case which is not a secured Claim.

Respectfully submitted,

**GENOVA BURNS, LLC**
*Counsel to Affiliated Physicians and Employers*
*Master Trust d/b/a Member Health Plan NJ*

Dated: ~~August 20~~December 9, 2021

**DONALD W. CLARKE**
110 Allen Road, Suite 304
Basking Ridge, NJ  07920
Phone: (973) 467-2700
Fax: (973) 467-8126

## <u>VERIFICATION</u>

I, LAWRENCE DOWNS, hereby certify and verify under penalty of perjury that:

I am the Chairman of the Board of Trustees for the Debtor. I have read this Plan of Liquidation and affirm that all factual references are true and accurate to the best of my knowledge, information, and belief. I am aware that if any of the allegations contained in the foregoing reply are willfully false, that I am subject to punishment.

*/s/Lawrence Downs*

By: _____

LAWRENCE DOWNS
*Chairman of the Board of Trustees for Affiliated Physicians and Employers Master Trust d/b/a Member Health Plan NJ*

**EXHIBIT A – Wind Down**

## EXHIBIT B - Cash on Hand on the Effective Date

Cash on hand as of December 31, 2021:                          $3,170,569
Less –

        Approximate Amount of Administrative Expenses
        Payable on Effective date of Plan.                    $2,856.212

        Amount of statutory costs and charges                 $0.00

        Amount of cure payments for executory contracts       $0.00

        Other Plan Payments due on Effective Date             $0.00

           Balance after paying these amounts……..    $314,357

The sources of the cash the Debtor will have on hand by the Effective Date are estimated as follows:

    $ 3,170,569    Total cash in the Debtor's bank account.

## EXHIBIT C - Liquidation Analysis

**Assets:**

| | |
|---|---|
| Cash | $3,170,569 |
| Accounts Receivables | $10,473,287 |
| Reinsurance Receivable | $1,402,131 |
| Rx Rebates | $0 |

**Total Assets at Liquidation Value**     **$15,045,987**

**Less:**

Chapter 11 Administrative Expenses and Priority claims:

(Aetna Run-out and special fee and other Post Petition Professional Fees)

$3,242,612

Balance for Medical, Prescription, other claims:     $11,803,375

Less Medical and Prescription claims:     $5,308,213

Balance for unsecured claims:     $6,495,162

Total dollar amount of unsecured claims:     $6,495,162

(Brokers Fees, Prepetition General Unsecured, and Est. Uncollectable Assessment of $3,676,323)

**Percentage of Claims Which Unsecured Creditors Would Receive Or Retain in a Chapter 7 Liquidation:**     **100%\*\***

> **\*\* While the liquidation recovery in a chapter 7 can be projected to be 100% based upon the statutory requirement that Members cover all shortfalls, a shift to a chapter 7 liquidation is likely to result in a termination of Concord's services (making administration of any recovery from Members exponentially more expensive and difficult) and a termination of the service agreement with Aetna (making administrative claims processing and payment exponentially more expensive and difficult, and will also result in a loss of provider discounts negotiated by and between Aetna and the providers). This will significantly increase the actual, noncontingent, claim exposure. The increased costs associated with the administration and claim exposure will require an exponentially higher assessment to be charged against the Members. This significantly lessens the likelihood that the full assessment is collected, or that the total amount of elevated claims is covered.**

**Percentage of Claims Which Unsecured Creditors Will Receive or Retain under the Plan:**     **100%**